**2020 IL 124754**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 124754)

THE STATE OF ILLINOIS *ex rel.* DAVID P. LEIBOWITZ, Appellee v. FAMILY VISION CARE, LLC, *et al.*, Appellants.

*Opinion filed November 19, 2020.*

JUSTICE MICHAEL J. BURKE delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Kilbride, Garman, Karmeier, Theis, and Neville concurred in the judgment and opinion.

**OPINION**

¶ 1 This appeal involves a claim brought under the Insurance Claims Fraud Prevention Act (Act) (740 ILCS 92/1 *et seq.* (West 2016)). The Act, which adopts nearly word for word a statute from California's Insurance Frauds Prevention Act

(see Cal. Ins. Code § 1871.7 (West 2016)), added civil penalties to existing criminal remedies for fraud against private insurance companies.

¶ 2        The Act contains an enforcement provision allowing a claim to be raised on the State's behalf by a private person, known as a relator, in a *qui tam* action. 740 ILCS 92/15 (West 2016). The State retains control over the litigation, but the Act entitles the relator to a portion of the proceeds or settlement if the lawsuit succeeds. *Id.* §§ 15, 20, 25.

¶ 3        A relator must be an "interested person" under the Act to file an action on the State's behalf, but the Act does not define that term. *Id.* § 15(a). Also, the Act is intended to remedy fraud against private insurers, where the only injury to the State is to its sovereignty, based on a violation of criminal law. This injury is different from the pecuniary injury addressed by the Illinois False Claims Act (740 ILCS 175/1 *et seq.* (West 2016)), which is a *qui tam* statute that confers standing on a relator to sue for fraud resulting in pecuniary injury to the State (*Scachitti v. UBS Financial Services*, 215 Ill. 2d 484, 508 (2005)).

¶ 4        The meaning of "interested person" and the nonpecuniary nature of the State's interest present two questions in this appeal regarding a relator's standing to sue under the Act: (1) whether a relator must have a personal claim, status, or right related to the *qui tam* action to qualify as an "interested person" and (2) whether a relator may bring a claim on behalf of the State for a violation of criminal law that results in injury to the State's sovereignty.

¶ 5        The issues arise in a *qui tam* action filed by the trustee of a bankruptcy estate of a whistleblower who was formerly employed by the allegedly defrauding party. The circuit court of Cook County determined that the trustee lacked standing to conduct the *qui tam* action and dismissed the one-count complaint under section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2016)).

¶ 6        The appellate court affirmed the judgment in part but reversed the dismissal and remanded the cause for further proceedings. The court held (1) a former employee-whistleblower with personal, nonpublic information of possible wrongdoing qualifies as an "interested person" under the Act and need not allege a personal claim, status, or right related to the proceedings and (2) the State need not suffer

money damages to partially assign its claim to a relator under the Act. 2019 IL App (1st) 180697, ¶¶ 30, 37. We affirm the judgment of the appellate court.

¶ 7                                    I. BACKGROUND

¶ 8        As this appeal is based on the involuntary dismissal of the complaint under section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2016)), we set forth and accept as true the well-pleaded facts alleged in the complaint as well as all reasonable inferences that arise from them. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31.

¶ 9        Defendant Family Vision Care, LLC (Family Vision Care), is an optometry practice in LaGrange, Illinois. Marie A. Cahill served as the office administrator from October 2012 through January 2016. She left her employment and filed for bankruptcy protection. A month later, she signed a separation agreement and general release that is not at issue in this appeal.

¶ 10       During her time with Family Vision Care, Cahill handled insurance billing practices. According to Cahill, about 90% of Family Vision Care's revenue came from claims it submitted to Vision Service Plan (VSP), a vision care health insurance company that is not a party to this action.

¶ 11       VSP covers claims from optometrists only if they have "majority ownership and complete control" of their medical practices. VSP disburses payments only after a practice signs a provider agreement certifying itself as "fully controlled and majority-owned" by an optometrist.

¶ 12       At the time Cahill was submitting Family Vision Care's claims to VSP, the practice was in fact owned by defendant Surgery Partners, Inc. (Surgery Partners), a medical practice management company that runs a network of more than 150 surgery centers and other medical practices in 29 states. Surgery Partners is a publicly traded company, but it is majority owned by H.I.G. Private Equity, a global private equity firm. Surgery Partners acquired Family Vision Care through a merger with defendant NovaMed Management Service, LLC (NovaMed), a smaller medical practice management company that owned the practice.

¶ 13 Defendant Jennifer Gula, O.D. (Dr. Gula), is an optometrist who worked at Family Vision Care while Cahill submitted the claims to VSP. Dr. Gula was employed by Surgery Partners and has never had an ownership interest in the practice.

¶ 14 Cahill alleges defendants engaged in fraud by knowingly and falsely certifying Family Vision Care's eligibility for VSP insurance payments and accepting payments to which Family Vision Care was not entitled. Specifically, Dr. Gula allegedly signed the provider agreements falsely certifying to VSP that she owned Family Vision Care. And Frank Soppa, a Surgery Partners executive, allegedly instructed Cahill to tell VSP that Dr. Gula owned Family Vision Care. Cahill alleges that Surgery Partners and Dr. Gula were fully aware of VSP's optometrist-ownership requirement and that Surgery Partners' management nevertheless directed Cahill to falsify information about the ownership of the practice.

¶ 15 About a year after Cahill left Family Vision Care, David P. Leibowitz, the trustee of Cahill's bankruptcy estate (Estate), filed a one-count complaint alleging defendants committed insurance fraud by submitting false claims to VSP.[1] The complaint alleges the fraudulent scheme caused VSP to approve Family Vision Care as a VSP network provider and pay "millions of dollars" of insurance claims that Family Vision Care submitted on behalf of its patients. The complaint does not allege Cahill suffered any injury or loss.

¶ 16 The complaint seeks relief under section 5(b) of the Act, which creates a private cause of action against any person who violates any provision of the Act and the criminal code relating to insurance fraud. 740 ILCS 92/5(b) (West 2016). The complaint is based on defendants' alleged insurance fraud against VSP in violation of section 17-10.5 of the Criminal Code of 2012 (Criminal Code) 720 ILCS 5/17-10.5(a)(1) (West 2016). Section 17-10.5(a)(1) provides that a person commits insurance fraud

---

[1]The complaint was filed under the caption "State of Illinois *ex rel.* Bankruptcy Estate of Marie A. Cahill," but federal law provides that it is the trustee who may prosecute an action on behalf of the bankruptcy estate. 11 U.S.C. § 323(b) (2012). The record indicates that Leibowitz is the Estate's trustee.

- 4 -

"when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company *** by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company *** intending to deprive an insurance company *** permanently of the use and benefit of that property." *Id.*

¶ 17    In turn, section 5(b) of the Act provides that a person who violates section 17-10.5 of the Criminal Code

"shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance. The court shall have the power to grant other equitable relief, including temporary injunctive relief, as is necessary to prevent the transfer, concealment, or dissipation of illegal proceeds, or to protect the public. The penalty prescribed in this subsection shall be assessed for each fraudulent claim upon a person in which the defendant participated." 740 ILCS 92/5(b) (West 2016).

The complaint sought damages of three times the amount of the false insurance claims plus civil penalties of $5000 to $10,000 per false claim. See *id.*

¶ 18    A claim for these civil penalties may be brought by the state's attorney of the county in which the conduct occurred or by the attorney general. *Id.* § 10. But the Act also allows for the enforcement by private citizens by authorizing *qui tam* actions in the name of the State. *Id.* § 15. A *qui tam* action is brought under a statute authorizing an informant to bring a civil action to recover a penalty for the commission or omission of a certain act and providing that a part of the penalty be paid to the informer. *Scachitti*, 215 Ill. 2d at 494. The Estate filed the action under the *qui tam* enforcement provisions of section 15, which allows private citizens with undisclosed information about insurance fraud to sue on the State's behalf for civil penalties. 740 ILCS 92/15 (West 2016).

¶ 19    Defendants filed a combined motion to dismiss the complaint arguing, *inter alia*, that the Estate lacks standing to bring the *qui tam* action. See 735 ILCS 5/2-619(a)(9), 2-619.1 (West 2016)). First, defendants argued that, because Cahill

did not allege a direct injury, she was not an "interested person" under the Act and her Estate could not bring a *qui tam* claim. Defendants asserted that only VSP could file a *qui tam* action because, as the allegedly defrauded party, it had a personal claim, status, or right to protect. Second, defendants argued that, although the State would have had standing to enforce its criminal laws through the Act, it cannot partially assign its nonpecuniary claim to a private citizen like Cahill. The circuit court agreed and dismissed the complaint with prejudice.

¶ 20　　　The appellate court rejected the circuit court's definition of "interested person[s]" as those with a "personal claim, status, or right" because such a restrictive definition would preclude claims by anyone other than an insurance company that lost money from fraud. The court, noting the Act does not define "interested person," relied on (1) the plain language of section 15 of the Act, which does not mention injury to the relator (740 ILCS 92/15 (West 2016)), (2) section 40 of the Act, which protects employees from retaliation for bringing *qui tam* claims (*id.* § 40), and (3) the Act's stated purpose of protecting the public from insurance fraud (*id.* § 5(c)). 2019 IL App (1st) 180697, ¶¶ 37, 39. The appellate court also relied on *People ex rel. Alzayat v. Hebb*, 226 Cal. Rptr. 3d 867, 889 (Ct. App. 2017), which stated the California statute does not limit standing to insurers or individual relators who have been personally injured. 2019 IL App (1st) 180697, ¶ 41. The appellate court concluded that the term "interested person" includes whistleblowers, like Cahill, with nonpublic information of possible wrongdoing. *Id.* ¶ 43.

¶ 21　　　The appellate court further held that the State suffered an "injury in fact" to its sovereignty based on the violation of its laws and could partially assign to a relator its claim for that type of injury. *Id.* ¶ 29. The court emphasized that section 15(a) does not mention the State suffering pecuniary injury and that the Act's stated purpose is to combat insurance fraud, rather than recoup damages. The court concluded, therefore, that the State need not suffer pecuniary injury for the Act to confer standing on a relator. Requiring the State to assign damages to a relator to establish standing would preclude a whistleblower from bringing a claim on the State's behalf, which the court concluded would defeat the purpose of the Act. *Id.*

¶ 22　　　Defendants filed a petition for leave to appeal, which we allowed pursuant to Illinois Supreme Court Rule 315 (eff. July 1, 2018). We granted the Taxpayers

Against Fraud Education Fund and the Coalition Against Insurance Fraud leave to submit briefs *amicus curiae* in support of the Estate's position, pursuant to Illinois Supreme Court Rule 345 (eff. Sept. 20, 2010).

¶ 23                                          II. ANALYSIS

¶ 24     On appeal, defendants renew their argument that the Estate lacks standing for two reasons. First, defendants assert the Estate is not an "interested person" authorized to sue under section 15(a) of the Act because Cahill did not suffer an injury related to the alleged fraud and did not allege how determination of the controversy would affect a claim or right personal to her. Second, defendants contend that criminal fraud against private insurance companies constitutes an injury merely to the State's sovereignty and that the State may not assign to private citizens the authority to enforce criminal law. Defendants seek reversal of the appellate court's decision and reinstatement of the circuit court's order dismissing the complaint.

¶ 25                                          A. Standing

¶ 26     "The standing doctrine assures that issues are presented to a court only by parties who have a sufficient stake in the outcome of the controversy." *People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill. 2d 473, 482 (1992). A party lacking an interest in the controversy has no standing to sue. *Id.*

¶ 27     The purpose of the doctrine is to ensure that courts are deciding actual, specific controversies and not abstract questions or moot issues. *In re Estate of Wellman*, 174 Ill. 2d 335, 344 (1996). "Standing 'is not simply a procedural technicality' (59 Am. Jur. 2d *Parties* § 30, at 416 (1987)), but rather is an aspect or a component of justiciability." *Id.*

¶ 28     The essence of the standing inquiry is whether the litigant, either in an individual or representative capacity, is entitled to have the court decide the merits of a dispute or a particular issue. *Id.* at 345. This court has held repeatedly that standing requires some injury in fact to a legally recognized interest. *Id.* The claimed injury, whether actual or threatened, must be distinct and palpable, fairly

traceable to the defendant's actions, and substantially likely to be prevented or redressed by the grant of the requested relief. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492-93 (1988).

¶ 29     A plaintiff need not allege facts establishing standing. *Wexler v. Wirtz Corp.*, 211 Ill. 2d 18, 22 (2004). Rather, the defendant bears the burden to plead and prove lack of standing. *Chicago Teachers Union, Local 1 v. Board of Education of the City of Chicago*, 189 Ill. 2d 200, 206 (2000).

¶ 30     The lack of standing is an "affirmative matter" that is properly raised as grounds for involuntary dismissal under section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2016)). *Scachitti*, 215 Ill. 2d at 508; *cf. Greer*, 122 Ill. 2d at 494 (lack of standing is an "affirmative" defense).

¶ 31     A motion to dismiss under section 2-619 admits the legal sufficiency of the complaint but raises a defense that allegedly defeats the complaint. *Patrick Engineering*, 2012 IL 113148, ¶ 31. When we review a dismissal under section 2-619, we accept as true all well-pleaded facts as well as all reasonable inferences that arise from them. *Id.* However, we will disregard all legal and factual conclusions in the complaint that are not supported by specific factual allegations. *Id.* An involuntary dismissal based on a lack of standing is reviewed *de novo*. *Glisson v. City of Marion*, 188 Ill. 2d 211, 220 (1999); *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116 (1993) (an order granting involuntary dismissal is reviewed *de novo* on appeal). Accordingly, we review *de novo* the circuit court's dismissal of the Estate's complaint and consider whether dismissal was proper as a matter of law.

¶ 32                                    B. "Interested Person"

¶ 33     The *qui tam* enforcement provision of section 15 is labeled "Action by an interested person." Subsection (a) of section 15 provides that "[a]n interested person, including an insurer, may bring a civil action for a violation of this Act for the person and for the State of Illinois." 740 ILCS 92/15(a) (West 2016). The Act does not define the phrase "interested person," so we apply the rules of statutory interpretation.

¶ 34    The fundamental rule of statutory interpretation is to ascertain and give effect to the legislature's intent, and the best indicator of that intent is the statutory language, given its plain and ordinary meaning. *Dew-Becker v. Wu*, 2020 IL 124472, ¶ 12 (citing *People v. Alexander*, 204 Ill. 2d 472, 485 (2003)). When the statutory language is clear and unambiguous, it is given effect as written without resort to other aids of statutory interpretation. *Id.* (citing *Petersen v. Wallach*, 198 Ill. 2d 439, 445 (2002)).

¶ 35    A court must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation. Each word, clause, and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous. The court may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. Also, a court presumes the General Assembly, in its enactment of legislation, did not intend absurdity, inconvenience, or injustice. *People v. Perez*, 2014 IL 115927, ¶ 9. We afford the statutory language the fullest, rather than narrowest, possible meaning to which it is susceptible. *Lake County Board of Review v. Property Tax Appeal Board*, 119 Ill. 2d 419, 423 (1988). The statutory interpretation of the term "interested person" is subject to *de novo* review. See *Dew-Becker*, 2020 IL 124472, ¶ 12 (citing *People v. Manning*, 2018 IL 122081, ¶ 16).

¶ 36    In this appeal, defendants renew their argument that the Estate lacks standing because Cahill does not have a pecuniary interest in defendants' alleged fraud against VSP. More generally, defendants assert that the plain and ordinary meaning of section 15 limits relators to those with a personal claim, status, or right capable of being affected by the controversy and that to hold otherwise would render the term "interested" meaningless or superfluous. Defendants contend that "interested person" must refer to someone with more than simple curiosity about the outcome of a *qui tam* action.

¶ 37    The common definition of "interested" includes both "having curiosity aroused" and "having a share or concern" in the outcome of some endeavor. Webster's Third New International Dictionary 1178 (2002) (defining "interested" as "having the attention engaged : having curiosity aroused" or "having a share or concern in some affair or project : liable to be affected or prejudiced"). Neither

section 15(a) nor the dictionary definition provides much guidance on discerning legislative intent. However, other provisions of the Act shed light on whom the General Assembly considers to be an "interested person."

¶ 38    For instance, section 15(b) requires that the interested person shall serve on the state's attorney and the attorney general "[a] copy of the complaint and a written disclosure of substantially all material evidence and information the person possesses." 740 ILCS 92/15(b) (West 2016). Thus, the only explicit qualification for a person filing a complaint under section 15 is possession of material evidence and information of the alleged fraud.

¶ 39    Another example is in section 25, which prescribes a relator's share of the proceeds. When the state's attorney or attorney general conducts an action initiated under section 15, the "person is entitled to receive an amount that the court determines is reasonable *based upon the extent to which the person contributed to the prosecution of the action*," amounting to at least 30% of the proceeds, subject to subsection (d). (Emphasis added.) *Id.* § 25(a). Conversely, if the state's attorney or attorney general does *not* proceed with the action, the person "shall receive an amount that the court decides is reasonable for collecting the civil penalty and damages," amounting to at least 40% of the proceeds, subject to subsection (d). *Id.* § 25(b). Thus, the relator's share of the proceeds is intended to be commensurate with his or her participation in the litigation.

¶ 40    Section 25 also contemplates a relator attempting to recover payments obtained fraudulently.

> "*If* the person bringing the action *** has paid money to the defendant or to an attorney acting on behalf of the defendant in the underlying claim, then he or she shall be entitled to up to double the amount paid to the defendant or the attorney if that amount is greater than 50% of the proceeds." (Emphasis added.) *Id.* § 25(c).

If *qui tam* standing were conditioned on the relator's pecuniary interest in payments made to the defendant, section 25(c) would not use the word "if."

¶ 41    Subsection (d) of section 25 imposes a 10% cap on a relator's share of the proceeds if the court finds the action is based primarily on disclosures of specific

- 10 -

information, other than information provided by the relator, in which case the award shall "tak[e] into account the significance of the information and the role of the person bringing the action in advancing the case to litigation." *Id.* § 25(d).

¶ 42    Section 25 illustrates how the relator's share should reflect the relative participation of the State and the relator in the litigation, any payments the relator *might* have made to the defendant, and the content of the information disclosed by the relator. Nothing in section 25 indicates that a pecuniary interest is a condition of the relator attaining standing.

¶ 43    Yet another example is in section 40 of the Act, which offers protections for employees who bring claims under the Act. *Id.* § 40. Section 40 provides, in relevant part,

> "An employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this Act, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this Act, shall be entitled to all relief necessary to make the employee whole." *Id.*

¶ 44    If an employee without a financial stake in his or her employer's fraud lacked standing under the Act, the General Assembly would not have enacted employee protections against retaliation for filing a *qui tam* action. Adopting defendants' interpretation would lead to the absurd result of an employee potentially needing to invoke the protections of section 40 after his or her *qui tam* action is dismissed for failure to show a personal legal interest.

¶ 45    Adopting defendants' position would also mean an insurer with information but without a "personal claim, status, or right capable of being affected" would not be sufficiently interested to file a *qui tam* action, despite the Act explicitly identifying insurers as interested persons. See *id.* § 15(a) (a claim may be brought by "[a]n interested person, *including an insurer*" (emphasis added)). The Act explicitly identifies employees and insurers as persons capable of filing a *qui tam* action, regardless of whether they have a legal or pecuniary interest in the fraud.

¶ 46    Sections 15, 25, and 40, when read together, illustrate that the defining characteristic of an "interested person" under the Act is the disclosure of material evidence of wrongdoing and involvement in the litigation, not a personal claim, status, or right affected by the fraud. Thus, we agree with the appellate court that, under the plain and ordinary meaning of the Act, Cahill is an "interested person" due to her knowledge of nonpublic information of possible wrongdoing gained through her employment with Family Vision Care.

¶ 47    Our interpretation is consistent with the Act's legislative purpose of protecting the public from insurance fraud. The civil penalties prescribed by section 5(b) are intended to be remedial rather than punitive, with "the goals of disgorging unlawful profit, restitution, compensating the State for the costs of investigation and prosecution, and alleviating the social costs of increased insurance rates due to fraud." *Id.* § 5(c). The appellate court accurately characterized defendants' position as effectively excluding uninjured whistleblowers from the definition of "interested person." Excluding uninjured whistleblowers from *qui tam* proceedings would defeat the purpose of the Act, as it would discourage employees from coming forward to disclose their employers' insurance fraud.

¶ 48    Defendants argue that dividing the proceeds between an uninjured relator and the State effectively punishes the defrauding party without remedying the defrauded party's injury, contrary to section 5(c). However, a defrauded party can pursue enhanced civil damages as part of a criminal prosecution for insurance fraud. 720 ILCS 5/17-10.5(e) (West 2016).

¶ 49    In fact, the Act contemplates a defrauded party seeking these civil damages under section 17-10.5(e). The civil penalties under the Act "shall not preclude, nor be precluded by, a criminal prosecution for the same conduct." 740 ILCS 92/5(c) (West 2016). If the *qui tam* court finds, after considering the Act's legislative goals, that the civil penalties would be punitive and would preclude, or be precluded by, a criminal prosecution, the court shall reduce that penalty appropriately. *Id.* Defendants focus on the relator and the State as the recipients of the proceeds of a *qui tam* action, losing sight of the way the civil penalties of section 5(b) of the Act and the civil damages of section 17-10.5(e) of the Criminal Code work in tandem to root out the fraud and remedy the defrauded party's injury.

¶ 50    Moreover, defendants' interpretation requires reading a limitation into the statute to effectively bar claims by anyone other than an insurer that lost money from fraudulent conduct. "We do not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the expressed intent." *Accettura v. Vacationland, Inc.*, 2019 IL 124285, ¶ 11. Defendants read into section 15(a) a limitation that conflicts with the remainder of the Act and its expressed intent to prevent insurance fraud. We decline defendants' invitation to read this limitation into the statute.

¶ 51    Defendants echo the circuit court's attempt to distinguish the Act from the False Claims Act, which also allows a relator to file a *qui tam* action for civil penalties and triple damages. See 740 ILCS 175/3(a)(1) (West 2016). This court has held that a relator has standing as a partial assignee of the State's claim in a *qui tam* action under the False Claims Act (*Scachitti*, 215 Ill. 2d at 508), but defendants claim the General Assembly's use of the modifier "interested" in the Act compels a different result. The False Claims Act provides that "[a] *person* may bring a civil action" for a violation of the statute (emphasis added) (740 ILCS 175/4(b)(1) (West 2016)), but the Act requires the relator to be an "*interested* person" (emphasis added) (740 ILCS 92/15 (West 2016)).

¶ 52    As the appellate court astutely observed, the phrase "interested person" appears in the Act only in section 15(a), while the *qui tam* plaintiff is described by the word "person" at least 29 times elsewhere in the Act. 2019 IL App (1st) 180697, ¶ 43. We conclude that the term "interested" is restrictive only to the extent that it identifies the relator as a person presenting undisclosed information of wrongdoing as defined in section 5(b). Contrary to defendants' assertion, our interpretation gives effect to the word "interested" in the Act.

¶ 53    Defendants also renew their argument that "interested person" should be given the same meaning in the Act as in other contexts. For instance, the Probate Act of 1975 defines an "interested person" as "one who has or represents a financial interest, property right or fiduciary status at the time of reference which may be affected by the action, power or proceeding involved." 755 ILCS 5/1-2.11 (West 2016). But the question of who can sue as an interested person in probate proceedings has no bearing on who can file a *qui tam* action under the Act, and the two statutes have different legislative purposes. Defendants propose similar

- 13 -

definitions of "interested" as requiring a financial interest in other contexts, such as an "interested shareholder" in corporate law or "interested" public officials in a public contracting situation.

¶ 54    However, the meaning or definition of a term cannot be blindly transferred from one context to another. See *Cohen v. Chicago Park District*, 2017 IL 121800, ¶ 22 ("Care must be taken when importing the definition of a term from one statute to another, since 'the context in which a term is used obviously bears upon its intended meaning.' " (quoting *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 29)); see 2019 IL App (1st) 180697, ¶ 42. Defendants cite nothing to suggest the General Assembly, when it adopted the Act, was referring to a definition of "interested person" found in any other context.

¶ 55    We note that the appellate court's interpretation of "interested person" was informed by *Alzayat*, where the California Court of Appeal addressed the statute on which the Act is based. Subsections (b) and (e)(1) of section 1871.7 of the California statute are the analogues to sections 5(b) and 15(a) of the Act.

¶ 56    *Alzayat* stated definitively, " '[a]s a true *qui tam* provision, Insurance Code section 1871.7 does not mandate that the relator has suffered his or her own injury.' " 2019 IL App (1st) 180697, ¶ 41 (quoting *Alzayat*, 226 Cal. Rptr. 3d at 889). *Alzayat* noted that the lawsuit under the California statute was " 'based on an injury allegedly suffered by the People of the State of California, and was not filed for the purpose of remedying an injury suffered by [the relator].' " *Id.* (quoting *Alzayat*, 226 Cal. Rptr. 3d at 888).

¶ 57    In this case, the appellate court concluded that, because the Act directly follows the California statute, *Alzayat* supports a finding that *qui tam* claims under the Act are not restricted only to insurance companies or individual relators who have been personally injured. *Id.* ¶ 42.

¶ 58    We believe the appellate court's reliance on *Alzayat* as persuasive authority was misplaced, as the decision did not directly address the meaning of the term "interested party" under the California statute. That said, the *dicta* in *Alzayat* is consistent with our interpretation that claims under the Act are not restricted to insurance companies or individual relators who have been personally injured.

¶ 59                                    C. Injury to Sovereignty

¶ 60        Defendants next argue that, even if the Act authorized the Estate to bring a *qui tam* action based on Cahill's status as an "interested person," the Estate did not allege the State suffered an "injury in fact" that could be assigned. Defendants again attempt to distinguish the False Claims Act and the Act, based on the different injuries the two statutes remedy. The False Claims Act addresses allegations of fraudulently obtained public funds and actual monetary damages suffered by the State. In contrast, the Act addresses violations of statutes that criminalize insurance fraud against private insurance companies. These criminal offenses result in an injury to the State's sovereignty, not to its treasury. Defendants conclude that the State cannot assign this kind of nonmonetary injury to a private citizen.

¶ 61        This court has not previously addressed standing in the context of the Act, but we are guided by our analysis in the context of *qui tam* litigation under the False Claims Act, formerly known as the Whistleblower Reward and Protection Act (see Pub. Act 96-1304, § 10 (eff. July 27, 2010)). *Scachitti*, 215 Ill. 2d at 504 (citing 740 ILCS 175/1 *et seq.* (West 2002)). The False Claims Act imposes civil liability upon " '[a]ny person' who, *inter alia*, 'knowingly presents, or causes to be presented, to an officer or employee of the State *** a false or fraudulent claim for payment or approval.' " *Scachitti*, 215 Ill. 2d at 504 (quoting 740 ILCS 175/3(a)(1) (West 2002)). A person who violates the False Claims Act is liable to the State for a civil penalty of not less than $5000 and not more than $10,000, plus treble damages. *Id.* at 505 (citing 740 ILCS 175/3(a) (West 2002)).

¶ 62        Like the Act, the False Claims Act provides that an action may be commenced by the attorney general. 740 ILCS 175/4(a) (West 2016). A private person may also bring a *qui tam* civil action under the False Claims Act " '*for the person* and for the State' (emphasis added), 'in the name of the State.' " *Scachitti*, 215 Ill. 2d at 505 (quoting 740 ILCS 175/4(b) (West 2002)).

¶ 63        In *Scachitti*, we acknowledged that in a *qui tam* action under the False Claims Act there is "no cognizable injury in fact suffered by the relator." *Id.* at 508. But we held, relying on *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000), that a relator has standing as a partial assignee of the State's claim. *Scachitti*, 215 Ill. 2d at 508.

¶ 64    The United States Supreme Court in *Vermont Agency* held "the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor" was an adequate basis for *qui tam*-relator standing because "[t]he [False Claims Act] can reasonably be regarded as effecting a partial assignment of the Government's damages claim." *Vermont Agency*, 529 U.S. at 773. Thus, the relator's complaint alleging an injury in fact to the United States conferred standing on the relator. *Id.* at 774.

¶ 65    Adopting the reasoning in *Vermont Agency*, this court held that a *qui tam* claim constitutes a partial assignment of the State's claim under the False Claims Act, permitting a private person to " 'bring a civil action for a violation of the [False Claims Act] *for the person and for the State*.' (Emphasis added.) 740 ILCS 175/4(b)(1) (West 2002)." *Scachitti*, 215 Ill. 2d at 508. "In other words, the interest of a *qui tam* plaintiff in a claim under the [False Claims] Act is justified as a partial assignment of the state's right to bring suit." *Id.*

¶ 66    The appellate court in this case accurately observed that both *Scachitti* and *Vermont Agency* "hold that the government's standing rests on the 'injury to its sovereignty based on the violation of its laws,' as well as the 'proprietary' injury suffered in False Claims Act cases. *Scachitti*, 215 Ill. 2d at 507; *Vermont Agency*, 529 U.S. at 771." 2019 IL App (1st) 180697, ¶ 29. However, nothing in those decisions imposes the requirement of a proprietary injury to the State as a condition of a relator's standing.

¶ 67    Neither section 5(b)'s provision for civil penalties nor the *qui tam* enforcement provision of section 15 mentions pecuniary injury to the State. Furthermore, the Act's stated purpose of combating insurance fraud supports the interpretation that the State need not suffer pecuniary damages for the Act to confer standing on a relator. 740 ILCS 92/5(c) (West 2016) ("The penalties set forth in subsection (b) are intended to be remedial rather than punitive, and shall not preclude, nor be precluded by, a criminal prosecution for the same conduct."). Conditioning standing on the State's assignment of pecuniary damages to a relator would bar an uninjured whistleblower from bringing a claim on the State's behalf, defeating the purpose of the Act.

¶ 68    Defendants argue that the False Claims Act is fundamentally different from the Act because the former facilitates recovery for the defrauded party and the latter

- 16 -

does not. Defendants point out that private individuals may pursue claims under the False Claims Act because the State has assigned to them its claim for damages and that any recovery is divided between the State and the relator. In contrast, the State suffers no pecuniary injury under the Act and therefore has no damages to assign. Instead, the Act protects a *private* insurance company (or self-insured entity) that is defrauded; the civil penalties from a successful claim may be divided between the government and an uninjured relator, leaving the defrauded party to bring its own action for damages against the defrauding party. See 720 ILCS 5/17-10.5(e)(1) (West 2016) (a person who commits insurance fraud shall be civilly liable to the defrauded party).

¶ 69      However, *Scachitti* held the government's standing in an action under the False Claims Act rests on the injury to its sovereignty based on the violation of its laws. The violation of the laws, not the defrauded party's opportunity for recovery under the *qui tam* statute, is what makes the defrauding party liable for civil penalties, under either the Act or the False Claims Act. See *Scachitti*, 215 Ill. 2d at 507; *Vermont Agency*, 529 U.S. at 771; 2019 IL App (1st) 180697, ¶ 29. Under either statute, the State suffers an "injury in fact" to its sovereignty based on violation of its laws and can assign to a relator its claim for that injury.

¶ 70      Defendants characterize the Act as assigning the State's power to enforce criminal law, contending this assignment is inconsistent with the principle that the power to assign is based on a cause of action being a property interest. Defendants assert that, while *Scachitti* turned on the principle that the government's claim is based on a violation of its laws and damages resulting from fraud, a claim under the Act addresses the State's right to enforce its criminal statutes through the imposition of civil penalties.

¶ 71      Defendants overstate the Act's reach in prescribing *qui tam* actions. Contrary to defendants' assertion, the Act does not purport to transfer to a private citizen the sovereign's unique authority to investigate, charge, and prosecute offenses. The Estate does not claim authority to perform any of these tasks. In fact, as the appellate court accurately observed, a plaintiff may bring a *qui tam* claim only if (1) the State authorizes the relator to sue on behalf of the State and the relator and (2) the State retains control of the litigation. *Scachitti*, 215 Ill. 2d at 494. The Act accomplishes both.

¶ 72    Defendants conflate the civil penalties prescribed by the Act with the criminal remedies under the Criminal Code. A stated purpose of the Act is to remedy, not punish, a violation of section 17-10.5 of the Criminal Code (see 740 ILCS 92/5(c) (West 2016)); it does not confer authority to prosecute an offense under that statute. Instead, the Act grants the State a proprietary interest in civil penalties for the offense, which the State may assign to a *qui tam* plaintiff.

¶ 73    Defendants also argue the appellate court erred in adopting the reasoning of *Stauffer v. Brooks Brothers, Inc.*, 619 F.3d 1321, 1325 (Fed. Cir. 2010), concerning the government's assignment of a purely sovereign interest to a relator under a *qui tam* statute. In *Stauffer*, the relator claimed that a bow-tie manufacturer falsely marked its products in violation of a statute that allowed anyone to sue on behalf of the United States. See 35 U.S.C. § 292(b) (2006). The court reasoned that the "*qui tam* provision operates as a statutory assignment of the United States' rights, and 'the assignee of a claim has standing to assert the injury in fact suffered by the assignor.' " *Stauffer*, 619 F.3d at 1325 (quoting *Vermont Agency*, 529 U.S. at 773). The *Stauffer* court reasoned that Congress, by enacting the statute, determined that a deceptive marking was harmful and prohibited, constituting an injury to the United States. *Id.* The court further reasoned that, because the government would have standing to enforce the statute, the relator, as the government's assignee, also had standing to enforce it. Citing *Vermont Agency*, the court stated, "we consider the question decided, that the United States may assign even a purely sovereign interest." *Id.* at 1327 n.3.

¶ 74    Defendants argue that *Stauffer* should not guide our analysis because (1) the decision does not bind this court, (2) unlike the Act, the false-marking statute in *Stauffer* did not address criminal conduct, and (3) Congress has since repealed the *qui tam* provision of the false-marking statute, rendering the decision immune from further judicial review. In response, we note that lower federal court decisions are not binding on Illinois courts but may be considered persuasive authority. *People ex rel. Ryan v. World Church of the Creator*, 198 Ill. 2d 115, 127 (2001). Furthermore, the difference between the type of conduct remedied by the Act and the false-marking statute does not diminish the appellate court's cogent interpretation of *Scachitti* and *Vermont Agency*. Finally, the repeal of the *qui tam* provision of the false-marking statute in *Stauffer* does not undermine the court's conclusion that the government may assign a purely sovereign interest.

¶ 75        Finally, defendants argue that interpreting the Act to allow a private citizen without a legal interest to exercise the State's law-enforcement power is unconstitutional because the attorney general is the sole officer authorized to represent the people in any litigation in which the People of the State are the real party in interest. The constitutionality of a statute is a question of law that we review *de novo*. *Scachitti*, 215 Ill. 2d at 504. Statutes are presumed constitutional and courts are required to construe statutes to " 'uphold their constitutionality whenever reasonably possible.' " *Id.* (quoting *Hill v. Cowan*, 202 Ill. 2d 151, 157 (2002)).

¶ 76        As the chief legal officer of the state, the attorney general's authority is derived from the Illinois Constitution (Ill. Const. 1970, art. V, § 15). *Lyons v. Ryan*, 201 Ill. 2d 529, 541 (2002) (citing *People ex rel. Scott v. Briceland*, 65 Ill. 2d 485, 492 (1976)). The duties of the attorney general are prescribed by law and include those powers traditionally held at common law. *Id.* (citing *Gust K. Newberg, Inc. v. Illinois State Toll Highway Authority*, 98 Ill. 2d 58, 67 (1983)). Only the attorney general is empowered to represent the State in litigation where the State is the real party in interest. *Id.* (citing *Fuchs v. Bidwill*, 65 Ill. 2d 503, 510 (1976)). The legislature may add to the powers of the attorney general, but it cannot reduce the attorney general's common-law authority in directing the legal affairs of the State. *Id.* (citing *Newberg*, 98 Ill. 2d at 67). Thus, legislation that usurps the common-law powers of the attorney general is invalid. *Id.* (citing *Briceland*, 65 Ill. 2d at 501-02).

¶ 77        The Act mirrors the False Claims Act in the way it entitles the State to receive notice and to intervene at the various stages of *qui tam* litigation. Under both statutes, the State may be represented by the attorney general, and under the Act, also by the state's attorney of the county in which the conduct occurred. The *Scachitti* court found the attorney general retains sufficient control over *qui tam* False Claims Act actions to render that statute constitutional, and we reach the same conclusion regarding the Act.

¶ 78        A *qui tam* plaintiff pursuing a claim under either the Act or the False Claims Act must serve the attorney general with a copy of the complaint and a written disclosure of the material evidence and information, and the complaint remains under seal for 60 days (plus any extensions granted by the court), during which the attorney general may investigate the claim and decide whether to intervene. *Scachitti*, 215 Ill. 2d at 505 (citing 740 ILCS 175/4(b)(2) (West 2002)); 740 ILCS

92/15(b) (West 2016). When the attorney general intervenes under either statute, it assumes " 'primary responsibility for prosecuting the action,' " and the *qui tam* plaintiff has a right to continue as a party in the case, subject to certain limitations. *Scachitti*, 215 Ill. 2d at 505 (quoting 740 ILCS 175/4(c) (West 2002)); 740 ILCS 92/20(a) (West 2016). The attorney general may dismiss or settle the action at any time " 'notwithstanding the objections of the person initiating the action.' " *Scachitti*, 215 Ill. 2d at 505 (quoting 740 ILCS 175/4(c)(2)(A), (c)(2)(B) (West 2002)); 740 ILCS 92/20(b) (West 2016). Both statutes also allow the attorney general to restrict the *qui tam* plaintiff's participation in the litigation. *Scachitti*, 215 Ill. 2d at 505 (citing 740 ILCS 175/4(c)(2)(C) (West 2002)); 740 ILCS 92/20(b) (West 2016). If the attorney general declines to proceed with the action, the *qui tam* plaintiff has the right to proceed, but the attorney general may intervene later. *Scachitti*, 215 Ill. 2d at 505 (citing 740 ILCS 175/4(c)(3) (West 2002)); 740 ILCS 92/20(c) (West 2016).

¶ 79    The attorney general has the right to monitor the action and receive copies of all pleadings and deposition transcripts. *Scachitti*, 215 Ill. 2d at 505 (citing 740 ILCS 175/4(c)(3) (West 2002)); 740 ILCS 92/20(c) (West 2016). If " 'certain actions of discovery by the person initiating the action would interfere with the State's investigation or prosecution of a criminal or civil matter,' " the attorney general may seek a stay of discovery or simply exercise the attorney general's ultimate authority and dismiss the *qui tam* action. *Scachitti*, 215 Ill. 2d at 505-06 (quoting 740 ILCS 175/4(c)(2)(A), (c)(4) (West 2002)); 740 ILCS 92/20(b), (d) (West 2016).

¶ 80    The *qui tam* provisions of the False Claims Act impose significant restrictions on *qui tam* plaintiffs. *Scachitti*, 215 Ill. 2d at 510. Although the *qui tam* plaintiffs may "conduct" the litigation on the State's behalf, the attorney general retains authority to "control" the litigation. *Scachitti* held the *qui tam* provisions of the False Claims Act do not usurp the constitutional powers of the attorney general to represent the State (*id.*), and the Act affords the state's attorney and the attorney general the same control. Our interpretation of the Act to allow a private citizen without a pecuniary interest to pursue a claim does not usurp the attorney general's constitutional powers to represent the State. See *id.*

¶ 81                                        CONCLUSION

¶ 82        For the foregoing reasons, we hold that (1) the Estate has standing under section 15(a) because Cahill is an "interested person" by virtue of her nonpublic information of possible wrongdoing and (2) the State suffered an "injury in fact" to its sovereignty based on violation of its laws and could partially assign its claim to the Estate under the Act. The appellate court therefore was correct when it reversed the dismissal of the complaint. The judgment of the appellate court is affirmed.

¶ 83        Appellate court judgment affirmed.

¶ 84        Circuit court judgment reversed.

¶ 85        Cause remanded.