**2022 IL 126856**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 126856)

LARRY E. SCHULTZ, Special Administrator of the Estate of Laurene T. Schultz, Deceased, Appellant, v. ST. CLAIR COUNTY *et al.*, Appellees.

*Opinion filed April 21, 2022.*

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Neville, Overstreet, and Carter concurred in the judgment and opinion.

Justice Garman specially concurred, with opinion, joined by Justice Michael J. Burke.

**OPINION**

¶ 1 In this case we are asked to consider whether the absolute immunity provided by section 4-102 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/4-102 (West 2016)) or the limited

immunity provided by section 15.1(a) of the Emergency Telephone System Act (ETS Act) (50 ILCS 750/15.1(a) (West 2016)) applies to claims premised on a 911 dispatcher's allegedly intentional or reckless refusal to dispatch emergency services when the caller was unable to provide an exact address.

¶ 2      The St. Clair County circuit court dismissed the claims with prejudice pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2016)), finding, *inter alia*, that section 4-102 of the Tort Immunity Act provided absolute immunity for plaintiff's claims and that the decedent's conduct was the sole proximate cause of her death. The appellate court affirmed. 2020 IL App (5th) 190256. For the following reasons, we hold that the limited immunity of section 15.1(a) of the ETS Act governs this claim, but we affirm the dismissal because decedent's conduct was the sole proximate cause of her death.

¶ 3                          BACKGROUND

¶ 4      In January 2018, plaintiff, Larry E. Schultz, special administrator of the estate of Laurene T. Schultz, filed a wrongful death and survival action against defendants, St. Clair County (County); St. Clair County CENCOM 911 (CENCOM 911), a public safety agency and public safety answering point within the state of Illinois; the Emergency Telephone System Board of St. Clair County (ETSB); and John Doe/Jane Doe, unidentified CENCOM 911 dispatchers. Plaintiff alleged that defendants engaged in willful and wanton conduct by refusing to dispatch 911 services, which resulted in the decedent's death.

¶ 5      Plaintiff specifically alleged that on October 22, 2017, he made multiple calls to 911, seeking a police dispatch to prevent his wife from driving away in her vehicle. He believed she was under the influence of alcohol at the time. According to the complaint, police were initially dispatched to the wrong location, and plaintiff's wife drove away. Plaintiff then made a second request for 911 assistance. He told the 911 dispatcher that his wife was at a local convenience store, provided the name of the store, and indicated that it was near the high school on State Street in Mascoutah, Illinois. Plaintiff alleged that the 911 dispatcher repeatedly advised plaintiff that police would not be dispatched without an exact address and that he should call back when he had it. While plaintiff attempted to locate an exact

address, his wife drove away from the convenience store. Shortly thereafter, she drove her vehicle off the road and died from her injuries.

¶ 6 In his complaint, plaintiff alleged that St. Clair County acts as a public agency authorized to provide emergency services, including police and medical services, to its residents. The County established the ETSB to create, manage, and oversee the operation of the 911 emergency system through a central dispatch center, CENCOM 911. CENCOM 911 serves as a public safety answering point responsible for receiving 911 calls and processing those calls according to a specified operational policy. CENCOM 911 employs telecommunicators or dispatchers who transmit information to emergency service providers.

¶ 7 Count I of the complaint was directed against the County. Plaintiff alleged that the County, acting through CENCOM 911 and its employee dispatchers, had a duty to relay accurate information to providers of emergency services and to dispatch those services in a timely manner. In violation of these duties and of those duties set forth in section 15.1(a) of the ETS Act, the County, through its dispatchers at CENCOM 911, acted in reckless disregard and indifference to decedent and the public by dispatching police to the wrong location and by refusing to contact police after plaintiff requested assistance. Plaintiff further alleged that the decedent drove her vehicle off the highway and was killed as a direct and proximate result of the "willful and wanton failure and refusal" of the County, through CENCOM 911 and its dispatchers, to act reasonably regarding the safety and welfare of the residents of Mascoutah.

¶ 8 Count II set forth similar allegations against CENCOM 911. Plaintiff additionally alleged that CENCOM 911 manned the dispatch line with improperly trained and/or unqualified employees, failed to properly supervise dispatchers who performed with utter indifference to the safety and welfare of the public, including decedent, and recklessly abandoned its own protocol and purpose by refusing to dispatch police to a known location to intercept decedent.

¶ 9 Count III was directed against the ETSB. Plaintiff alleged that the ETSB acted in reckless disregard for decedent's safety by failing to manage the selection of dispatchers to ensure qualified employees were providing 911 services. Plaintiff also alleged that the ETSB acted in reckless disregard for decedent's safety by failing to monitor CENCOM 911's implementation of the ETS Act to protect

decedent and the public from CENCOM 911's refusal to properly train and/or control the actions of its dispatchers.

¶ 10    Count IV was directed against the 911 dispatchers and set forth similar allegations as in counts I and II. Count V alleged a claim against the County pursuant to section 27-6 of the Survival Act (755 ILCS 5/27-6 (West 2016)).

¶ 11    In response, defendants filed a combined motion to dismiss pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2018)). Relevant here, defendants argued that the complaint should be dismissed with prejudice pursuant to section 2-619(a)(9) of the Code (*id.* § 2-619(a)(9)) because they were immune from civil liability under section 4-102 of the Tort Immunity Act (745 ILCS 10/4-102 (West 2016)). Further, defendants maintained that plaintiff's complaint should be dismissed because decedent's conduct was the sole proximate cause of her injuries and death.

¶ 12    The circuit court granted defendants' motion, finding, in pertinent part, that they had absolute immunity from civil liability under section 4-102 of the Tort Immunity Act, and that decedent's negligence was the sole proximate cause of her injuries and death.

¶ 13    The appellate court affirmed the circuit court's dismissal. 2020 IL App (5th) 190256. Relying in part on this court's holding in *DeSmet v. County of Rock Island*, 219 Ill. 2d 497 (2006), the appellate court held the absolute immunity found in section 4-102 of the Tort Immunity Act applies where liability is premised on the failure of a dispatcher to dispatch police in a timely fashion. 2020 IL App (5th) 190256, ¶ 13. After examining the purpose and provisions of the ETS Act, the court was not convinced that section 15.1 applied to situations in which a 911 dispatcher allegedly failed or refused to dispatch emergency services. *Id.* ¶ 17. Instead, the court found that section 15.1 was limited to "provid[ing] an immunity for failures within that infrastructure and technology itself." *Id.* Moreover, the court stated section 15.1 "was not designed to supersede the immunities set forth in the Tort Immunity Act." *Id.*

¶ 14    Justice Wharton dissented. He believed the majority's interpretation overlooked the express language in section 15.1 that makes its limited immunity applicable to the performance or provision of 911 services. *Id.* ¶¶ 24-25 (Wharton, J., dissenting).

He also thought the plaintiff's allegations may involve the 911 infrastructure and that *DeSmet* was not controlling. *Id.* ¶ 31.

¶ 15 We allowed plaintiff's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2020). Additionally, we allowed motions for leave to file *amicus curiae* briefs from the Illinois Trial Lawyers Association, the City of Chicago, and the Illinois Municipal League. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 16 ANALYSIS

¶ 17 The claims at issue in this appeal were dismissed by the circuit court pursuant to section 2-619 of the Code. A motion to dismiss brought under that section admits the legal sufficiency of a plaintiff's complaint but asserts affirmative matter that defeats the claim. *Smith v. The Vanguard Group, Inc.*, 2019 IL 123264, ¶ 9. When ruling on such a motion, a court must accept as true all well-pled facts in the plaintiff's complaint and any reasonable inferences that arise from those facts. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31. Our review of the dismissal of a section 2-619 motion is *de novo*. *Rehfield v. Diocese of Joliet*, 2021 IL 125656, ¶ 23.

¶ 18 Immunity

¶ 19 Our review of the dismissal in this case requires us to construe the immunity provisions of section 4-102 of the Tort Immunity Act and section 15.1(a) of the ETS Act. This court has never considered the scope of immunity provided in the ETS Act or the interplay between the immunities provided by section 4-102 and section 15.1(a) as enacted at the time of the incidents alleged. As with any statute, our primary goal is to ascertain and give effect to the legislative intent. *Wilkins v. Williams*, 2013 IL 114310, ¶ 14. The best indication of that intent is the plain and ordinary language of the statute. *Dew-Becker v. Wu*, 2020 IL 124472, ¶ 12. The words and phrases should be interpreted in relation to each other and the entire act, and no word or provision should be rendered meaningless. *Cassens Transport Co. v. Industrial Comm'n*, 218 Ill. 2d 519, 524 (2006). When the language of the statutory provision at issue is clear and unambiguous, it must be applied as written

without reliance upon other aids of construction. *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 11.

¶ 20    As we have previously explained, immunity statutes are in derogation of the common law and must be strictly construed against the public entity or employee asserting that immunity. See, *e.g.*, *Monson v. City of Danville*, 2018 IL 122486, ¶ 15. Our review is *de novo*. *Wilkins*, 2013 IL 114310, ¶ 13. Mindful of that analytical framework, we begin by examining the plain language of the two statutes.

¶ 21    Section 4-102 of the Tort Immunity Act provides:

"Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals." 745 ILCS 10/4-102 (West 2016).

¶ 22    Section 4-102 addresses situations where no police protection is provided to the public and where inadequate protection is provided. Section 4-102 contains no exception for willful and wanton misconduct. *Id.*; *DeSmet*, 219 Ill. 2d at 514-15. Consequently, defendants assert that this section immunizes them where the allegations in plaintiffs' complaint involve a failure to provide police protection services.

¶ 23    The ETS Act, however, contains its own immunity provision. Prior to 2016, section 15.1 provided that "[n]o public agency *** or employee *** shall be liable for any civil damages as a result of any act or omission, except willful or wanton misconduct, *in connection with developing, adopting, operating, or implementing any plan or system required by this Act*." (Emphasis added.) 50 ILCS 750/15.1 (West 2014).

¶ 24    In 2015, section 15.1 was amended, broadening the scope of its immunity. See Pub. Act 89-403, § 5 (eff. Jan. 1, 2016). The amended statute provides:

"[i]n no event shall a public agency, *** public safety answering point, *** or its *** employees *** be liable for any civil damages *** that directly or

indirectly results from, or is caused by, any act or omission in the development, design, installation, operation, maintenance, *performance, or provision of 9-1-1 service required by this Act, unless the act or omission constitutes gross negligence, recklessness, or intentional misconduct*." (Emphasis added.) 50 ILCS 750/15.1(a) (West 2016).

¶ 25    Thus, as demonstrated by its plain language, the limited immunity provision in section 15.1(a) of the ETS Act governs the scope of liability relating to a public safety answering point (PSAP) employee's "performance[ ] or provision of 9-1-1 service." *Id.* The only question then is whether plaintiff's allegation—that a 911 dispatcher, performing under the authority of the ETS Act as a PSAP employee, intentionally or recklessly refused to dispatch emergency services because the caller did not provide an exact address—falls under the "performance[ ] or provision of 9-1-1 service" language of section 15.1(a) rather than the general failure to "provide police protection service" found in section 4-102.

¶ 26    Defendants gloss over and fail to analyze this specific language of the recently amended provisions of section 15.1(a). The appellate court, in an apparent attempt to harmonize section 4-102 and section 15.1(a), determined that section 15.1(a) only concerns the technical and infrastructure aspects of the 911 system. 2020 IL App (5th) 190256, ¶ 17. This construction is erroneous. As the plain language indicates, PSAP employees are now specifically included under the purview of section 15.1(a). Additionally, contrary to the appellate court's analysis, the phrase "performance[ ] or provision of 9-1-1 service" must have meaning beyond merely the technical and infrastructure aspects of a 911 system. Otherwise, there would have been no need for this new language, as the former statute already provided limited immunity for liability involving the operation or implementation of a 911 system.

¶ 27    An established principle of statutory interpretation provides that every clause of a statute must be given a reasonable meaning, if possible, and should not be rendered meaningless or superfluous. *Skaperdas v. Country Casualty Insurance Co.*, 2015 IL 117021, ¶ 15. Yet, in finding that the amendment applies only to the ETS Act's technical requirements, the appellate court's interpretation renders the added language superfluous. Furthermore, if the legislature wanted to limit the scope of limited immunity to merely the technical aspects of the 911 service, it

could have done so expressly. In the absence of the legislature's express statement of such a limitation, we decline to read one into the statute. See, *e.g.*, *In re Christopher K.*, 217 Ill. 2d 348, 364 (2008).

¶ 28    We need only look to other provisions of the ETS Act to understand that the act has a broader scope than simply the technology and infrastructure of the 911 system. For instance, section 2 of the ETS Act defines a " 'Direct dispatch method' " to mean "a 9-1-1 service that provides for the direct dispatch by a PSAP telecommunicator of the appropriate unit upon receipt of an emergency call and the decision as to the proper action to be taken." 50 ILCS 750/2 (West 2018). " 'Public safety answering point' " or " 'PSAP' " is defined as "a set of call-takers authorized by a governing body and operating under common management that receive 9-1-1 calls and asynchronous event notifications for a defined geographic area and processes those calls and events according to a specified operational policy." *Id.* That section now also specifically defines a " 'Public safety telecommunicator' " as "any person employed in a full-time or part-time capacity at an answering point whose duties or responsibilities include answering, receiving, or transferring an emergency call for dispatch to the appropriate emergency responder." Pub. Act 102-9, § 10 (eff. June 2, 2021) (amending 50 ILCS 750/2). Thus, the language of the ETS Act specifically concerns itself with the conduct of the 911 dispatcher.

¶ 29    Where a general statutory provision and a more specific statutory provision relate to the same subject, we will presume that the legislature intended the more specific provision to govern. *Moore v. Green*, 219 Ill. 2d 470, 480 (2006). Similarly, we presume that the legislature intended the more recent statutory provision to control. *Id.* The General Assembly adopted the Tort Immunity Act in 1965 after this court abolished the sovereign immunity of municipalities from tort claims. *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11 (1959). That Act included section 4-102. The ETS Act was enacted in 1975, and its immunity provision was most recently amended more than 50 years after the Tort Immunity Act was adopted. The express purpose of the ETS Act includes "develop[ing] and improv[ing] emergency communication procedures *** in such a manner as to be able to quickly respond to any person calling the telephone number '9-1-1' seeking police, fire, medical, rescue, and other emergency services." 50 ILCS 750/1 (West 2016).

¶ 30 Further, the ETS Act provides comprehensive rules and regulations applicable to the 911 dispatcher in relation to answering, receiving, or dispatching emergency services. As authorized by section 10 of the ETS Act (*id.* § 10), section 1325.415 of the Illinois Administrative Code addresses standard procedures applicable to telecommunicators. See, *e.g.*, 83 Ill. Adm. Code 1325.415 (2017) (formerly 83 Ill. Adm. Code 725.415 (repealed at 40 Ill. Reg. 8170 (eff. May 25, 2016))) (listing requirements that telecommunicators be trained in emergency dispatch procedures and have a minimum of 80 hours of training curriculum, continuing education, and specifics regarding the handling of emergency calls, including specialized training for dispatch to emergency medical providers under the Emergency Medical Services Systems Act). Those provisions now additionally include special responsibilities in responding to sexual assault and sexual abuse call handling. See 83 Ill. Adm. Code 1325.600 (2017).

¶ 31 Defendants' interpretation, that the limited immunity of section 15.1(a) does not apply to a 911 dispatcher who intentionally or recklessly refuses to dispatch emergency services, would also subvert the limited immunity provided by other statutes, including the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/101 *et seq.* (West 2016)). See *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 604 (2008) (in construing statutory language, we may consider the consequences that would result in interpreting the statute one way or another).

¶ 32 As we have previously explained, the Domestic Violence Act creates liability for the willful and wanton conduct of law enforcement officers who fail to respond to domestic violence calls. See *Moore*, 219 Ill. 2d at 489. If section 4-102 applied to the refusal to dispatch 911 services, the immunity provision would be completely undermined. In that instance, a 911 dispatcher's intentional or reckless refusal to dispatch the services necessary to respond to a domestic violence call would be met with no consequences. This outcome would directly contravene the purpose of the domestic violence statute, which is to correct the historically inadequate response to domestic violence and to expand the remedies for domestic violence victims. See *Id.* at 490.

¶ 33 Lastly, to the extent that defendants rely on *DeSmet* to conclude that the absolute immunity provided by section 4-102 of the Tort Immunity Act applies

here, that reliance is misplaced. *DeSmet* was a 2006 case that did not attempt to construe or address a conflict between section 4-102 and the ETS Act; indeed, the decision was written prior to the applicable amendments in section 15.1(a) of the ETS Act. Rather than relying on *DeSmet*, it would be more logical to conclude that the amendment to section 15.1(a) was a legislative response to the holding in *DeSmet* and that it was meant to effect a change in the law.

¶ 34    In sum, based on the plain language of the ETS Act and its purpose, comprehensive scheme, and structure, section 15.1(a) of the Act provides limited immunity for a PSAP employee's breach of duties related to the performance or provision of 911 services required by the Act. Accordingly, an allegation that a PSAP employee intentionally or recklessly refuses to dispatch vital emergency services implicates the limited immunity provided by section 15.1(a) rather than the absolute immunity provided by section 4-102 of the Tort Immunity Act.

¶ 35                              Proximate Cause

¶ 36    Next, we consider the alternate basis for the trial court's dismissal with prejudice, namely, the lack of proximate cause. Although the appellate court did not rule on this issue, we may affirm its judgment on any basis appearing in the record. *Monson*, 2018 IL 122486, ¶ 41.

¶ 37    The issue of proximate cause is ordinarily a question of fact to be determined by the trier of fact, but that issue may be determined as a matter of law by the court where the facts as alleged show that the plaintiff would never be entitled to recover. *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257-58 (2004). Proximate cause encompasses two distinct requirements: cause in fact and legal cause. *Id.* at 258. "A defendant's conduct is a 'cause in fact' of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury." *Id.* The conduct is a material element and substantial factor in bringing about the injury if, absent the defendant's conduct, the injury would not have occurred. If actual cause is established, then the question is whether defendant should be held legally responsible for it. *Id.*

¶ 38    We have also noted that there is a subset of proximate cause cases that distinguish between a condition and causation. *Thompson v. County of Cook*, 154 Ill. 2d 374, 383 (1993). As we explained,

> " '[t]he cause of an injury is that which actually produces it, while the occasion is that which provides an opportunity for causal agencies to act.' If a defendant's negligence does nothing more than furnish a condition by which injury is made possible, that negligence is not the proximate cause of injury." *Id.* (quoting *Briske v. Village of Burnham*, 379 Ill. 193, 199 (1942)).

¶ 39    For example, in *Thompson*, a passenger was killed when the car driven by an intoxicated driver went off the highway. *Id.* at 377-80. The passenger's family sought to recover from Cook County, alleging that the county was negligent by not placing warning signs of a curve in the road on the highway. *Id.* at 380. The driver of the car had admitted that he was driving under the influence of alcohol and drove at an excessive rate of speed. *Id.* at 382. We held that although the allegedly defective road may have provided a condition for the accident, it was not the cause of the accident. *Id.* at 383. Rather, the driver's actions in driving drunk, speeding, eluding the police, and disregarding the traffic signs were the sole proximate cause of this accident; the road provided nothing more than "a location where [the driver's] negligence came to fruition." *Id.*

¶ 40    Here, plaintiff cannot establish that the injury to the decedent would not have occurred absent defendants' alleged refusal to dispatch the police to the convenience store. At most, defendants' alleged conduct furnished a condition by which her injury was made possible. It is undisputed that decedent was "intoxicated," "inebriated," and driving "under the influence of alcohol," a violation of section 11-501 of the Illinois Vehicle Code. 625 ILCS 5/11-501 (West 2016). It is further undisputed that defendants did not furnish her with the vehicle or the alcohol or facilitate her decision to get into her vehicle and drive while intoxicated. The decedent's decision to drive while intoxicated was the sole proximate cause of her injuries and death.

¶ 41    Because we find the trial court properly dismissed plaintiff's complaint as a matter of law, we need not consider the other alternate basis for dismissal raised by defendants.

¶ 42                    CONCLUSION

¶ 43       For the reasons that we have stated, we affirm the judgment of the appellate court, albeit on different grounds. The judgment of the circuit court is likewise affirmed.


¶ 44       Judgments affirmed.


¶ 45       JUSTICE GARMAN, specially concurring:

¶ 46       I agree with the majority that the circuit court correctly dismissed this case based on plaintiff's inability to establish proximate cause. I write separately, however, because I disagree with the majority's analysis on the immunity issue, finding its discussion not only unnecessary to the resolution of this case but also incorrect on the law.


¶ 47                    I. Proximate Cause

¶ 48       All seven members of this court agree that plaintiff cannot establish that the injury to the decedent would not have occurred absent defendants' refusal to dispatch the police to the convenience store. Thus, we unanimously agree that the circuit court properly dismissed plaintiff's complaint as a matter of law. Because this case can be resolved solely on the proximate cause issue, I believe we should go no further.

¶ 49       "Courts of review will not decide moot or abstract questions, will not review cases merely to establish precedent, and will not render advisory opinions." *Peach v. McGovern*, 2019 IL 123156, ¶ 64. "Moreover, courts in Illinois will not consider issues where the result will not be affected regardless of how those issues are decided." *West Bend Mutual Insurance Co. v. Krishna Schaumburg Tan, Inc.*, 2021 IL 125978, ¶ 60; see also *In re Commitment of Hernandez*, 239 Ill. 2d 195, 201 (2010) (stating "[t]his court generally declines to issue advisory opinions on moot or abstract questions, and if it is apparent that this court cannot grant effectual relief, the court should not resolve the question before it merely for the sake of setting precedent to govern future cases"). Although I would conclude this court's analysis

on the issue of proximate cause, I will nevertheless set forth my reasons for disagreeing with the majority's analysis on the immunity issue.

¶ 50                                    II. Tort Immunity Act

¶ 51        The General Assembly adopted the Tort Immunity Act in 1965 after this court abolished the sovereign immunity of municipalities from tort claims in *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11 (1959). *Harrison v. Hardin County Community Unit School District No. 1*, 197 Ill. 2d 466, 471 (2001); see 1965 Ill. Laws 2983. "The purpose of the Tort Immunity Act is to protect local public entities and public employees from liability arising from the operation of government. By providing immunity, the General Assembly sought to prevent public funds from being diverted from their intended purpose to the payment of damage claims." *Harris v. Thompson*, 2012 IL 112525, ¶ 17.

¶ 52        In terms of police protection, section 4-102 of the Tort Immunity Act provides as follows:

> "Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals." 745 ILCS 10/4-102 (West 2016).

¶ 53        In 2006, this court had the opportunity in *DeSmet v. County of Rock Island*, 219 Ill. 2d 497 (2006), to consider section 4-102 in the context of a call for emergency services. In that case, the plaintiff sued numerous governmental entities, including dispatch centers and dispatchers, to recover damages for the death of Doris Hays. *Id.* at 502-03. According to a witness, Hays was driving her vehicle near the county line of Rock Island County and Henry County when her car left the road and ran into a ditch. *Id.* at 500. The witness called the clerk of the Village of Orion to report the incident. *Id.* at 500-01. The village clerk contacted a dispatcher for Henry County, who then contacted the dispatcher for the City of Moline and the City of East Moline. *Id.* at 501. That dispatcher then contacted the Rock Island County sheriff's department. *Id.* No emergency services were dispatched to the scene of the

accident. *Id.* at 502. Three days later, Hays's body was found lying outside her vehicle at the accident scene. *Id.*

¶ 54        The plaintiff filed a complaint, asserting wrongful death and survival claims against Rock Island County, Henry County, the Village of Orion, the City of Moline, the City of East Moline, and various individuals in their official capacities. *Id.* at 502-03. The circuit court dismissed the complaint with prejudice, ruling that section 4-102 of the Tort Immunity Act immunized all defendants. *Id.* at 503. The appellate court affirmed. *Id.* at 504.

¶ 55        The plaintiff appealed, and this court considered, in part, "whether a municipality that sends no assistance whatsoever in response to a request for help at an accident scene can claim the immunity provided by section 4-102 of the Tort Immunity Act for failure to provide adequate police or service." *Id.*

¶ 56        After considering the language of the Tort Immunity Act and several appellate court decisions, we found section 4-102 is implicated where "the assistance required *** falls within the statutory umbrella of 'police protection services.' " *Id.* at 512. We rejected the plaintiff's attempt to equate the failure to " 'respond' " to a call for assistance with a failure to provide " '*any* police service,' " finding that the "governmental defendants rendered police protection service to the general public via their dispatch centers. The dispatch services simply proved inadequate in this instance insofar as they failed to deliver personalized police services to the scene in a timely manner." (Emphasis in original.) *Id.* at 513.

¶ 57        This court noted section 4-102 "is comprehensive in the breadth of its reach, addressing situations where no police protection is provided to the general public and those in which inadequate protection is provided." *Id.* at 515. In affirming, we concluded:

"Although we firmly believe that citizens have a right to expect the police to respond in a situation like this, the issue here is whether section 4-102 of the Tort Immunity Act immunizes the defendants from liability and the consequent payment of public funds in satisfaction of an individual's damage claims. [Citation.] Section 4-102 immunity applies in this case." *Id.* at 522.

We did recognize, however, that "there may be additional exceptions to the application of section 4-102 where a legislative enactment identifies a specially protected class of individuals to whom statutorily mandated duties are owed." *Id.* at 521.

¶ 58                                III. ETS Act

¶ 59        In 1975, the General Assembly adopted the ETS Act, which declares it is "in the public interest to shorten the time required for a citizen to request and receive emergency aid." 50 ILCS 750/1 (West 2016); see Pub. Act 79-1092, § 1 (eff. Sept. 25, 1975).

> "The General Assembly further finds and declares that the establishment of a uniform, statewide emergency number is a matter of statewide concern and interest to all inhabitants and citizens of this State. It is the purpose of this Act to establish the number '9-1-1' as the primary emergency telephone number for use in this State and to encourage units of local government and combinations of such units to develop and improve emergency communication procedures and facilities in such a manner as to be able to quickly respond to any person calling the telephone number '9-1-1' seeking police, fire, medical, rescue, and other emergency services." 50 ILCS 750/1 (West 2016).

¶ 60        Through various amendments over the years, the ETS Act required that by July 1, 2017, every local public agency was to be within the jurisdiction of a 911 system and, by July 1, 2020, every 911 system in Illinois was required to provide Next Generation 911 service. *Id.* § 3(a), (b). "System" is defined as "the communications equipment and related software applications required to produce a response by the appropriate emergency public safety agency or other provider of emergency services as a result of an emergency call being placed to 9-1-1." *Id.* § 2. Also, "9-1-1 system" is defined as "the geographic area that has been granted an order of authority by the Commission or the Statewide 9-1-1 Administrator to use '9-1-1' as the primary emergency telephone number." *Id.*

¶ 61        The ETS Act states every system is to include "police, firefighting, and emergency medical and ambulance services" (*id.* § 4) and that the digits "9-1-1"

- 15 -

are to be "the primary emergency telephone number within the system" (*id.* § 5). As to the capabilities of the system, section 6 provides, in part, as follows:

> "All systems shall be designed to meet the specific requirements of each community and public agency served by the system. Every system shall be designed to have the capability of utilizing the direct dispatch method, relay method, transfer method, or referral method in response to emergency calls. The General Assembly finds and declares that the most critical aspect of the design of any system is the procedure established for handling a telephone request for emergency services." *Id.* § 6.

¶ 62　　In setting forth an exemption from civil liability for developing or operating an emergency telephone system, section 15.1(a) of the ETS Act provides, in part, as follows:

> "In no event shall a public agency, the Commission, the Statewide 9-1-1 Advisory Board, the Administrator, the Department of State Police, public safety agency, public safety answering point, emergency telephone system board, or unit of local government assuming the duties of an emergency telephone system board, or carrier, or its officers, employees, assigns, or agents be liable for any civil damages or criminal liability that directly or indirectly results from, or is caused by, any act or omission in the development, design, installation, operation, maintenance, performance, or provision of 9-1-1 service required by this Act, unless the act or omission constitutes gross negligence, recklessness, or intentional misconduct." *Id.* § 15.1(a).

In considering a prior version of section 15.1 of the ETS Act, the Second District found its purpose to be the provision of "limited tort immunity for the agencies responsible for creating and running the emergency telephone system in Illinois." *Chiczewski v. Emergency Telephone System Board of Du Page County*, 295 Ill. App. 3d 605, 608 (1997).

¶ 63　　　　　　　　　　　　　　IV. Plaintiff's Complaint

¶ 64　　After considering the statutes and the relevant case law, I would find the Tort Immunity Act applies here over the ETS Act. This court was clear in *DeSmet* that

section 4-102 is implicated where "the assistance required *** falls within the statutory umbrella of 'police protection services.' " *DeSmet*, 219 Ill. 2d at 512. Although plaintiff attempts to distinguish *DeSmet* because it did not involve an alleged failure of 911 services, this court stated section 4-102 "is comprehensive in the breadth of its reach, addressing situations where no police protection is provided to the general public and those in which inadequate protection is provided." *Id.* at 515. Moreover, we found section 4-102 applied where "governmental defendants rendered police protection service to the general public via their dispatch centers" but those services proved inadequate, "insofar as they failed to deliver personalized police services to the scene in a timely manner." *Id.* at 513. Plaintiff has alleged the same inadequacies here.

¶ 65    In support of his argument that section 15.1 of the ETS Act applies over the Tort Immunity Act, plaintiff relies on this court's decisions in *Moore v. Green*, 219 Ill. 2d 470 (2006), and *Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324 (2008), arguing those cases illustrate the proper analysis when statutory immunity provisions conflict. I would find those cases distinguishable, as they involved statutes with highly specific purposes, rules, and regulations set forth by the General Assembly.

¶ 66    In *Moore*, 219 Ill. 2d at 474, this court considered whether the absolute immunity of the Tort Immunity Act or the limited immunity provided by section 305 of the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/305 (West 2002)) applied to claims that a municipality and two of its police officers were willful and wanton in failing to assist a domestic-violence victim.

¶ 67    In finding the Domestic Violence Act applied, the court considered the purposes of that act, including recognizing the seriousness of the crime, the need for victim support, and the responsibilities of law enforcement officers. *Moore*, 219 Ill. 2d at 480-81. The Domestic Violence Act at issue in that case set forth specific responsibilities and duties for law enforcement officers responding to domestic violence calls. *Id.* at 489. Along with creating the duties necessary to further the purpose of combatting domestic violence, this court found the legislature limited "civil liability for law enforcement agencies and their officers who breach these duties by willful and wanton conduct." *Id.*

¶ 68	In *Abruzzo*, 231 Ill. 2d at 327, we found the limited immunity of the Emergency Medical Services (EMS) Systems Act (EMS Act) (210 ILCS 50/3.150(a) (West 2004)) applied over the Tort Immunity Act. This court reviewed the EMS Act and stated it was "a comprehensive, omnibus source of rules governing the planning, delivery, evaluation, and regulation of emergency medical services in Illinois." *Abruzzo*, 231 Ill. 2d at 341. The EMS Act at issue set forth detailed requirements for first responders, EMS lead instructors, emergency medical dispatchers, trauma nurse specialists, and emergency communications registered nurses. 210 ILCS 50/3.60, 3.65, 3.70, 3.75, 3.80 (West 2004). After reviewing the statute as a whole, we found "[t]he broad purposes, comprehensive scheme, and entire structure of the EMS Act indicate an intent for the immunity provision from that Act to govern cases involving emergency medical services." *Abruzzo*, 231 Ill. 2d at 347.

¶ 69	In contrast to the actor-specific focus of these statutes and their purposes, the ETS Act at issue here is concerned with the infrastructure necessary to ensure 911 services are available throughout Illinois. As the appellate majority noted, the provisions of the ETS Act focus on the technical requirements, operational standards, and design capabilities of a 911 system. Unlike the statutes at issue in *Moore* and *Abruzzo*, the ETS Act does not set forth rules, regulations, procedures, policies, or training requirements with respect to 911 dispatchers or telecommunicators. It does not indicate the legislative intent to govern cases involving the conduct of 911 dispatchers. Instead, its focus is system-based, as defined, and not specific to the role of dispatchers, which is not defined.

¶ 70	Moreover, a reading of the entirety of the ETS Act does not evince an intent to apply section 15.1 to a situation alleged by plaintiff—that a dispatcher failed or refused to dispatch the police in response to a 911 call. Thus, in contrast to *Moore* and *Abruzzo*, the potential exception to the application of section 4-102 of the Tort Immunity Act that we recognized in *DeSmet* does not apply here.

¶ 71	As stated, the ETS Act provides for technical, operational, and design infrastructure of the 911 system, and section 15.1 sets forth limited immunity in the development, design, installation, operation, maintenance, performance, and provision of the 911 service. By its terms, it does not conflict with or contradict the Tort Immunity Act and this court's interpretation of that Act as relating to police protection services.

- 18 -

¶ 72    Moreover, since *DeSmet* was decided, the legislature has not amended the immunity provision in section 4-102 contrary to our interpretation to limit its meaning. See *id.* at 343 (stating this court's "interpretation is considered part of the statute itself until the legislature amends it contrary to that interpretation"). Given the allegations in plaintiff's complaint and applicable law, I would find the limited immunity of section 15.1 of the ETS Act does not apply in this case. Instead, the absolute immunity afforded by section 4-102 of the Tort Immunity Act applies and immunizes defendants against plaintiff's claims.

¶ 73    JUSTICE MICHAEL J. BURKE joins in this special concurrence.