17 November 1999

No. 2--98--1329

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

WILLIAM JANES, ) Appeal from the Circuit Court

) of McHenry County.

     Plaintiff-Appellee, )

) No. 95--CH--120

v.                          )

)

CENTEGRA HEALTH SYSTEM, d/b/a )

Northern Illinois Medical )

Center,                    ) Honorable

                   ) Michael T. Caldwell,

Defendant-Appellant. ) Judge, Presiding. 

_________________________________________________________________

JUSTICE RAPP delivered the opinion of the court:

Defendant, Centegra Health System, d/b/a Northern Illinois Medical Center (NIMC), appeals the trial court's entry of summary judgment in favor of plaintiff, William Janes, M.D.  We affirm.

NIMC is a hospital located in McHenry County.  In 1994 NIMC entered into a written pathology services agreement with Pathology and Nuclear Medicine Associates (PNMA).  Pursuant to this agreement, PNMA was to staff NIMC with pathologists employed by PNMA and furnish pathology services to NIMC and its patients.  All PNMA pathologists were required to apply for and be granted clinical privileges at NIMC.

Dr. Janes was a pathologist employed by PNMA pursuant to a written contract with PNMA.  In 1995, Dr. Janes was granted clinical privileges at NIMC.  PNMA thereafter assigned Dr. Janes to work at NIMC.

On May 10, 1995, Dr. Sherman Porter performed a dilatation and curettage (D&C) procedure on a patient at NIMC and obtained tissue specimens from the lining of the patient's uterus (endometrial tissue) and from the entrance to the uterus (endocervical tissue) for pathological examination to rule out possible malignancy.  The tissue specimens were sent to Dr. Janes for examination, but the endometrial tissue specimen was lost before Dr. Janes could examine it.

The next day, Dr. Janes conferred with Dr. Bradley, another PNMA pathologist, about how to handle the situation.  Dr. Bradley told Dr. Janes that if NIMC were to learn that another specimen had been lost, PNMA would be fired.  PNMA had previously lost specimens at NIMC and other hospitals, including at least one other case involving Dr. Janes.  After reviewing the endocervical tissue specimen, Dr. Bradley advised Dr. Janes to report his findings in a "general way."  Dr. Janes understood this to mean that he should prepare his pathology report to combine his findings for the two tissue specimens so that the report would not reflect that the endometrial tissue specimen had been lost.

Dr. Janes then prepared and issued his report in that fashion, indicating that the tissue was benign.  No mention was made of the lost tissue specimen.  Dr. Janes admitted that standard practice required him to state in the report that the endometrial tissue specimen had been lost and not examined so that the surgeon could decide whether to repeat the procedure to obtain a new specimen.

Dr. Janes also talked to Dr. Porter by telephone and advised Dr. Porter that the tissue appeared benign.  He never mentioned to Dr. Porter that the endometrial tissue specimen had been lost.  Dr. Janes admitted that he should have told Dr. Porter that the specimen had been lost.  After the report issued, Dr. Janes took no steps to advise anyone at NIMC that the specimen had been lost.

Dr. Janes then instructed a PNMA technician to prepare a false slide from endometrial tissue of another patient and to label it as the missing tissue sample.  This was done in case Dr. Porter or anyone else wanted to see the slide of the endometrial tissue from Dr. Porter's patient.  The slide was prepared in accordance with Dr. Janes's instructions and sent to his office at NIMC, where he placed it in his desk.  Dr. Janes claimed that he got the idea from another PNMA pathologist who told him about a similar incident in which a specimen was lost and a false slide was prepared using tissue from another patient.

Dr. Janes later learned that the technician had confessed to a manager of PNMA that she had prepared the false slide.  The president of PNMA confronted Dr. Janes and told him not talk to anyone about the incident and that he would "take care of it."  Dr. Janes called another PNMA pathologist and instructed him to throw away the false slide.  PNMA then reassigned Dr. Janes to work at another hospital.

Dr. Porter subsequently received an anonymous call informing him of the incident.  As a result of the anonymous call, NIMC commenced an investigation.

NIMC held a special medical staff meeting concerning the incident, and an 
ad hoc
 committee of the medical staff was appointed to further investigate the incident in accordance with the medical staff bylaws.  Pursuant to the medical staff bylaws, corrective action may be taken against a physician for reasonable cause or when his or her performance or professional conduct is considered detrimental to patient safety, compromises the quality of care, or violates NIMC's bylaws, rules or regulations.  Corrective action may include a recommendation that the physician's privileges be revoked, limited, or suspended.

It was determined that Dr. Janes would be placed on "precautionary suspension" and that written notice of the action would be sent to Dr. Janes.  "Precautionary suspension" under the medical staff bylaws is an emergency suspension of a physician's clinical privileges to practice at NIMC and is invoked in cases where the physician willfully or grossly violates hospital rules or behaves in a manner that requires prompt action to protect the health of patients.  This procedure permits the temporary suspension of privileges without prior notice and hearing.

NIMC sent written notice to Dr. Janes advising him that he had been placed on precautionary suspension and that an 
ad hoc
 committee had been appointed to investigate the matter and to report whether further corrective action was warranted.  The letter also advised Dr. Janes of his right under the medical staff bylaws to request a hearing concerning the precautionary suspension and his opportunity to interview with the 
ad hoc
 committee.  PNMA terminated Dr. Janes's employment on the same day NIMC sent written notice to him.

Dr. Janes voluntarily appeared before the 
ad hoc
 committee and submitted to an interview concerning the incident.  Dr. Janes understood that this was part of the formal peer review process under the medical staff bylaws.

By letter through his attorney, Dr. Janes requested a formal hearing on the precautionary suspension.  The letter also informed NIMC of Dr. Janes's termination of employment with PNMA and his intent to resign from the medical staff as soon as the investigation was concluded.

After receiving the 
ad hoc
 committee's report, the medical executive committee of the medical staff met to review the matter and consider possible further corrective action against Dr. Janes.  Dr. Janes voluntarily attended this meeting to present his views concerning the incident.  The medical executive committee determined that further corrective action was warranted and subsequently gave written notice to Dr. Janes advising him of the committee's recommendations and of his right to a hearing under the medical staff bylaws.

Dr. Janes's attorney responded, contending that Dr. Janes's privileges had been automatically terminated upon the termination of his employment with PNMA and that NIMC was without "jurisdiction" to take further action.  He cited section 8.5 of the pathology services agreement between NIMC and PNMA, which provides in pertinent part:

"PNMA hereby agrees and shall cause each of the Physicians *** to agree that each of their respective memberships on the Staff and their clinical privileges at the Hospital shall terminate concurrently and automatically with the termination or expiration of this Agreement *** as it applies to PNMA or Physicians for any reason or with PNMA's or Physician's respective termination pursuant to the terms hereof or his or her leaving of PNMA for any reason.  Any provision of the Hospital policies or the Bylaws *** to the contrary notwithstanding, PNMA agrees and shall cause each physician to agree that, effective as of termination of this Agreement:

(i) The Hospital shall have no duty to provide notice, hearing or review in the event the Staff membership of any or all of the Physicians is terminated;

(ii) Any notice, hearing or review and any rights thereto that may be granted or required under the Bylaws or applicable state or other law, rule or regulation is hereby waived; and

(iii) PNMA and each such Physician hereby agree to hold the Hospital harmless and to indemnify it from any and all loss or liability incurred by the Hospital in reliance upon such party's covenants under this paragraph.  Without limiting the effect of the foregoing, PNMA shall cause each of its Physicians providing the Services to agree in writing to the foregoing and to provide Hospital upon request with suitable evidence of such agreement."

The medical executive committee responded that it could not accept Dr. Janes's position.

When the medical executive committee reconvened, it determined that questions concerning the pathology services agreement should be resolved by the board of directors of NIMC.  Accordingly, the committee decided to defer to the Board on the question of the effect of the pathology services agreement.

After reviewing the matter, the board rejected Dr. Janes's request that NIMC treat his privileges as having been automatically terminated upon the termination of his employment from PNMA.  Instead, the board elected to proceed with the corrective action under the medical staff bylaws to revoke Dr. Janes's privileges.

On November 11, 1995, Dr. Janes filed a complaint requesting injunctive and declaratory relief.  Dr. Janes sought to enjoin NIMC from taking any form of action to terminate his privileges and from reporting the termination of his privileges to the National Practitioner Data Bank.  He also requested a declaration that the pathology services agreement between NIMC and PNMA had automatically terminated his privileges when he was fired by PNMA and that NIMC was without jurisdiction to take corrective action to terminate his privileges.

Dr. Janes filed a motion for summary judgment seeking the injunctive relief asked for in his complaint.  The motion for summary judgement was supported by Dr. Janes's own affidavit, which attested to the injury he would sustain if reported to the National Practitioner Data Bank.  After hearing oral arguments, the trial court entered summary judgment in favor of Dr. Janes.  The summary judgment stated:

"Plaintiff's motion is granted, the court having found that section 8.5 of the Pathology Services Agreement is binding upon both parties to this action and the hospital thereby waived its right to proceed against plaintiff under its bylaws."

NIMC timely appealed.

Summary judgment is a drastic means of resolving a lawsuit and should be allowed only when the moving party's right to judgment is clear and free from doubt.  
First American Title Insurance Co. v. TCF Bank, F.A.
, 286 Ill. App. 3d 268, 272 (1997).  Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  735 ILCS 5/2--1005(c) (West 1996); 
Purtill v. Hess
, 111 Ill. 2d 229, 240 (1986).  The trial court must construe the evidence strictly against the movant and liberally in favor of the nonmoving party.  
Purtill
, 111 Ill. 2d at 240.

The propriety of an order granting summary judgment is a question of law which we review 
de novo
.  
Jiffy Lube International, Inc. v. Agarwal
, 277 Ill. App. 3d 722, 725 (1996).  "If, after reviewing the pleadings and evidentiary material before the trial court, the reviewing court determines that a material issue of fact exists or that the summary judgment was based on an erroneous interpretation of the law, then reversal is warranted."  
Jiffy Lube
, 277 Ill. App. 3d at 725.

On appeal, NIMC contends that the trial court erred in granting Dr. Janes's motion for summary judgment.  NIMC argues that (1) the trial court erred in basing its decision on the language of section 8.5 of the pathology services agreement that provided for the automatic termination of privileges upon the termination of a physician's employment with PNMA; (2) that the record created a genuine issue of material fact in that section 8.5 of the pathology services agreement was for the benefit of NIMC and that NIMC was entitled to waive, and did waive, section 8.5 in connection with Dr. Janes's termination of employment; and (3) that NIMC's action to revoke Dr. Janes's privileges is subject to the rule of nonreview by the courts, inasmuch as NIMC complied with its medical staff bylaws. 

I. WHETHER THE TRIAL COURT ERRED IN BASING ITS DECISION ON       SECTION 8.5 OF THE PATHOLOGY SERVICES AGREEMENT

NIMC first argues that the trial court erred in basing its decision on section 8.5 of the pathology services agreement, which provided for the automatic termination of clinical privileges upon the termination of a physician's employment with PNMA.  Dr. Janes contends that he automatically lost his clinical privileges at NIMC when he was terminated by PNMA and, therefore, NIMC has no legal interest in taking corrective action to terminate his clinical privileges.

We have carefully reviewed the pathology services agreement, Dr. Janes's employment contract with PNMA, NIMC's medical staff bylaws, and the applicable statutes in this case.  The pathology services agreement was an exclusive contract between NIMC and PNMA.  Section 8.5 of the pathology services agreement imposes an obligation on PNMA to cause its physicians to waive any and all procedural rights under the bylaws and under state or any other law, rule, or regulation and to agree to forfeit their privileges at NIMC upon the termination of the contractual relationship between NIMC and PNMA or the termination of the physician's employment with PNMA.

Section 10.4(b)(2)(H) of the Hospital Licensing Act (210 ILCS 85/10.4(b)(2)(H) (West 1996)) makes the terms of an exclusive contract binding upon physicians who are members of a medical group entering into such an exclusive contract.  Section 10.4(b)(2)(H) of the Hospital Licensing Act provides in relevant part:

"If an exclusive contract is signed by a representative of a group of physicians, a waiver contained in the contract shall apply to all members of the group unless stated otherwise in the contract."  210 ILCS 85/10.4(b)(2)(H) (West 1996).

Pursuant to section 10.4(b)(2)(H) of the Hospital Licensing Act, it is clear that Dr. Janes is bound by section 8.5 of the pathology services agreement.  Thus, by virtue of section 8.5 of the pathology services agreement, Dr. Janes's clinical privileges at NIMC automatically terminated when he was terminated from employment by PNMA.

Article 7.1(a) of NIMC's medical staff bylaws permits NIMC to consider "corrective action" against physicians who have "clinical privileges."  Because Dr. Janes's clinical privileges at NIMC automatically terminated pursuant to section 8.5 of the pathology services agreement when he was terminated from employment by PNMA, by virtue of section 7.1(a) of the NIMC's medical staff bylaws, NIMC may not now take "corrective action" against Dr. Janes.

We therefore conclude that the trial court did not err in basing its decision to grant summary judgment on section 8.5 of the pathology services agreement.

II. WHETHER THE RECORD CREATED A GENUINE ISSUE OF MATERIAL        FACT

NIMC next argues that the record created a genuine issue of material fact in that section 8.5 of the pathology services agreement was for the benefit of NIMC and that NIMC was entitled to waive, and did waive, section 8.5 in connection with the concurrent and automatic termination of Dr. Janes's clinical privileges upon the termination of his employment with PNMA. Dr. Janes contends that section 8.5 of the pathology services agreement and section 10.4(b)(2)(H) of the Hospital Licensing Act contain self-executing language.  Thus, according to Dr. Janes, NIMC was not entitled to waive the automatic termination of Dr. Janes's clinical privileges.

A self-executing instrument is one that is "effective immediately without the need of any type of implementing action."  Black's Law Dictionary 1364 (7th ed. 1999).  We agree with Dr. Janes that section 8.5 of the pathology services agreement is self- executing in that the termination of a physician's staff and clinical privileges at NIMC is effective "concurrently and automatically" with the physician's termination of employment with PNMA, without the need of any further action by NIMC.

Neither party has provided any authority pertaining to whether a self-executing provision may be waived.  NIMC argues that "[a]ny contract provision may be waived by the party for [
sic
] whom it is intended to benefit" and that section 8.5 of the pathology services agreement is intended to benefit NIMC rather than Dr. Janes.

As we have already noted, the pathology services agreement is an exclusive contract between NIMC and PNMA.  NIMC contends, and we agree, that section 8.5 of the agreement is beneficial to NIMC in that it need not satisfy the grounds for the revocation of privileges or comply with a physician's due process rights set forth in the medical staff bylaws upon the termination of a physician's employment.  We also believe that section 8.5 is beneficial to PNMA in that it protects PNMA's exclusive right to provide pathology services to NIMC when a pathologist is terminated from its employment.

NIMC argues that hospitals should have the freedom to waive this type of automatic-termination-of-privileges provision.  We disagree and decide, as the trial court did, that section 8.5 of the pathology services agreement is binding on both Dr. Janes and NIMC and that NIMC waived its right to proceed against Dr. Janes under its medical staff bylaws when it provided for the automatic termination of clinical privileges in the pathology services agreement.

III. WHETHER NIMC'S ACTION TO REVOKE DR. JANES'S PRIVILEGES IS SUBJECT TO THE RULE OF NONREVIEW BY THE COURTS

Finally, NIMC argues that a hospital's decision to revoke or limit a physician's privileges is not subject to judicial review, except to the extent that a private hospital must follow its own bylaws in doing so.  See 
Chessick v. Sherman Hospital Ass'n
, 190  Ill. App. 3d 889, 894 (1989).  As we have already determined that NIMC did not have the authority to proceed against Dr. Janes under its bylaws, we find no merit in this argument.

NIMC admits that its purpose in pursuing "corrective action" against Dr. Janes was so that it could report the termination of Dr. Janes's clinical privileges to the National Practitioner Data Bank.  Dr. Janes argues that, if NIMC reports a "for cause" revocation of his clinical privileges to the National Practitioner Data Bank, the resultant publication will directly injure his ability to gain future employment as a pathologist anywhere in the country.

Under the Health Care Quality Improvement Act of 1986 (HCQIA) (42 U.S.C.A. §11101 
et seq.
 (West 1995)), a hospital must report professional review action that adversely affects a physician's clinical privileges.  42 U.S.C.A. §11133 (West 1995).  Such actions are included in a physician database, known as the National Practitioner Data Bank, which is used as a clearinghouse for information about individual physicians and may be accessed by entities to which a physician applies for membership or the privilege to practice.  42 U.S.C.A. §11135 (West 1995).  A reportable professional review action is limited to an action based on competence or professional conduct of an individual physician and excludes actions based upon a physician's association with a private group practice. 42 U.S.C.A. §§11133(a), 11151(9) (West 1995).

NIMC "determined that it should carry through with its investigation and take corrective action, as a matter of obligation to its patients, the local community and the health care community in general" and, as such, "[c]orrective action would also serve to send a message to other physicians, and the community, that such conduct will not be tolerated at NIMC."  While this is a very compelling argument, NIMC may not take corrective action in violation of its own bylaws.

Our holding that NIMC may not take corrective action to terminate Dr. Janes's clinical privileges does not foreclose the possibility of reporting his conduct to the National Practitioner Data Bank through other appropriate channels.  We note that anyone may make a report to the Disciplinary Board of the Illinois Department of Professional Regulation concerning a physician's competence or professional conduct.  See 225 ILCS 60/24 (West 1996).  If the Department sanctions Dr. Janes, it would then be required to report the action to the National Practitioner Data Bank.  See 42 U.S.C.A. §11132 (West 1995).  Thus, NIMC may report the incident concerning Dr. Janes's professional misconduct to the Illinois Department of Professional Regulation for further action.

For the foregoing reasons, we hold that the trial court did not err in entering summary judgment in favor of Dr. Janes.  We therefore affirm the judgment of the circuit court of Du Page County.

Affirmed.

GEIGER and THOMAS, JJ., concur.