2024 IL App (1st) 231245

No. 1-23-1245

Opinion filed December 9, 2024.

First Division

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| BENJAMIN LEVINE, DARRYL NORTON JR., PRZEMYSLAW KOLZA, JOSHUA BARR, ROBERT PRIMM, and AMIN SAHTOUT, Individually and on Behalf of Others Similarly Situated, | ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 17 CH 16683 |
| THE CITY OF CHICAGO, a Municipal Corporation, | ) ) ) | |
| Defendant-Appellee | ) ) | |
| (Darryl Norton Jr., Przemyslaw Kolza, Joshua Barr, Robert Primm, and Amin Sahtout, Individually and on Behalf of Others Similarly Situated, Plaintiffs-Appellants). | ) ) ) ) ) | The Honorable Pamela McLean Meyerson, Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith concurred in the judgment and opinion.
Justice Pucinski concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    This appeal arises from a challenge to the placement of certain automated speed

enforcement systems, *i.e.*, speed cameras, in the City of Chicago (City) pursuant to section 11-

208.8 of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/11-208.8 (West 2010)). Specifically, section 11-208.8 (speed camera statute) permits the City to place a speed camera "within one-eighth of a mile from the nearest property line of any facility, area, or land owned by a *park district* used for recreational purposes." (Emphasis added.) *Id.* After paying the City for speed violations captured by the speed cameras, plaintiffs, individually and on behalf of others, commenced this action.[1] The circuit court entered summary judgment in the City's favor.

¶ 2     On appeal, plaintiffs argue that the speed cameras are not within the requisite distance from a facility, area, or land owned by a park district. The City contends, however, that the speed cameras are appropriately located near Challenger Park (Challenger) and Kelly Park (Kelly). The parties dispute, among other things, what constitutes a "park district" and what it means to "own" park property. For the following reasons, we reverse and remand for further proceedings.

¶ 3                                I. Background

¶ 4     Under the speed camera statute, an "automated speed enforcement system," or speed camera, is "a photographic device, *** installed or utilized in a *safety zone* and designed to record the speed of a vehicle and obtain a clear photograph" of the vehicle violating the Vehicle Code or a similar ordinance. (Emphasis added.) *Id*. § 11-208.8(a). A safety zone "includes an area that is within one-eighth of a mile from the nearest property line of any facility, area, or land owned by a park district used for recreational purposes." *Id*. § 11-208.8(a).

¶ 5     Three speed cameras (1142 W. Irving Park Road, 4429 N. Broadway and 4446 N. Broadway) are at issue here.[2] According to the City, those cameras are all located within one-eighth of a mile from the boundaries of Challenger. Additionally, the Irving Park Road camera is

---

[1]After this appeal was filed, plaintiff Benjamine Levine withdrew from the litigation.
[2]Plaintiffs' statement of facts contains improper argument. See Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). While this permits us to strike the statement or dismiss the appeal, we choose to disregard the inappropriate material. See *Holton v. Syncreon North America, Inc.*, 2019 IL App (2d) 180537, ¶ 24.

within one-eighth of a mile from the boundaries of Kelly. It is undisputed at this juncture that the City, rather than the Chicago Park District, holds title to the land underneath both parks.

¶ 6                                    A. The 1991 Agreement

¶ 7     Challenger was created in 1991 through the Challenger Park Cooperative Development Agreement (1991 Agreement). That agreement was entered into between the City, the Chicago National League Ball Club, Inc. (the Cubs), the Chicago Transit Authority (CTA), and the Chicago Park District.

¶ 8     Essentially, the Chicago Park District owned a playlot, Buena Circle Park (Buena), while the City and the CTA owned adjacent parcels of land. Those adjacent parcels were combined to form Challenger. Although Challenger serves as an extension of Buena, it appears that the two parks have remained separate and distinct. Our record contains diagrams purporting to show the various areas of Challenger, and Buena, but those diagrams are largely illegible.

¶ 9     The 1991 Agreement stated that the City and the CTA were leasing certain portions of their property to the Chicago Park District. The contracting parties were all responsible for completing certain portions of construction, subject in some instances to approval by the other contracting parties. Those parties also granted each other irrevocable licenses over their respective parcels as necessary to fulfill their rights and obligations toward the project. Furthermore, the City and the Cubs were required to contribute to the Chicago Park District's construction costs.

¶ 10    According to the agreement, the contracting parties wished to develop the site
        "as parkland including multiple purpose fields, basketball courts, ice skating rinks, a
        jogging path, a rolling prairie area and other landscaping, as an extension of [Buena], for

use by members of the nearby communities and the public in general, and provide landscaped and lighted off-street parking for patrons [attending Cubs games]." Many, but not all, of those features came to fruition.

¶ 11    The 1991 Agreement also required the Chicago Park District to "maintain, repair, replace, rebuild and reconstruct the Improvements located on or within Park Areas A and B, Multiple Use Areas A and B and the Jogging Path." Additionally, "[t]he Park District shall use and regulate the use of the Multiple Use Areas as a public park at all times subject to the Cubs' [parking]." Similarly, "[t]he Park District shall use and regulate the use of Park Areas A and B and the Jogging Path as an open public park." Notably, the Chicago Park District was the only contracting party charged with the regulation of park use.

¶ 12    The agreement further stated that it "shall terminate on December 31, 2015," and "may be altered, modified, extended or terminated prior to such date only upon execution by all of the Parties of an instrument to that effect." Moreover,

> "[o]n the last day of the Term, each tenant shall surrender and deliver up to its respective landlord the premises leased by this Agreement without delay. *** Upon termination of this Agreement, all Improvements shall become the property of the owner of the respective premises on which such Improvements are located."

¶ 13    The record shows that no modifications to the agreement, written or otherwise, were made prior to the termination of the 1991 Agreement on December 31, 2015. Despite this, the parties continued to function in essentially the same manner. Toward the end of 2016, discussions began regarding a new agreement that would include not only Challenger but nearby Kelly.

¶ 14                                    B. 2018 Agreement

¶ 15    In 2018, the City, the CTA and the Chicago Park District entered into an agreement with respect to both parks (2018 Agreement). The agreement acknowledged that while Challenger and Kelly were located on the City's property, the Chicago Park District had "operated and maintained Challenger Park and Kelly Park" since 1991 and wished to continue doing so.

¶ 16    The 2018 Agreement stated that

> "[t]he City shall grant the Park District use of portions of the Property for those portions of Challenger Park and Kelly Park that lie in and over the Park Area. The Park Area shall be utilized and operated by the Park District as public parks for the benefit of the public."

In addition,

> "the City grants to the Park District use of portions of the Property, subject to the CTA Air Rights Easement and Pole Easement, on which Challenger Park and Kelly Park exist ***, for the purposes of operating and maintaining the Property as Challenger Park and Kelly Park for the benefit of the public."

Furthermore, the district "shall own, insure and maintain *** recreational improvements." Attachments to the agreement included a list of the parks' recreational improvements.

¶ 17    Similar to the 1991 Agreement, the 2018 Agreement required the Chicago Park District to provide maintenance and operations "in accordance with the usual and customary rules and regulations governing use and occupancy of property operated or maintained by the [Chicago] Park District[.]"

¶ 18                                    C. Circuit Court Proceedings

¶ 19    Plaintiffs commenced this action in December 2017 and ultimately filed a second-amended complaint challenging the three speed cameras at issue. Plaintiffs sought a judgment

declaring that the City's operation of the speed cameras violated the speed camera statute, as well as article VII, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VII, § 6), and section 9-101 of the Municipal Code of Chicago (Chicago Municipal Code §§ 9-101-020, 9-101-010 (added Apr. 12, 2012)).[3] Plaintiffs also asserted claims for unjust enrichment. Their claims were generally premised on the notion that the speed cameras were not within one-eighth of a mile of property owned by a park district because the City, rather than the Chicago Park District, owned Challenger and Kelly.

¶ 20    In November 2022, the City moved for summary judgment, arguing that the City constituted a "park district" within the meaning of the speed camera statute. While that statute did not define "park district," another section of the Vehicle Code did.

¶ 21    Specifically, section 11-605.3, which permits a municipality to reduce speed limits near parks, defines "park district" to include "any municipality *** that operates a public recreation department or public recreation facilities that has recreation facilities that are not on land owned" by a park district organized under the Park District Code or the Chicago Park District Act. 625 ILCS 5/11-605.3(a)(1)(C) (West 2012). The City argued that it qualified as a park district because it operated public recreation facilities—namely, Millenium Park and the Chicago River Walk. The City did not, however, claim to operate Challenger or Kelly.

¶ 22    The City also argued that the Chicago Park District "owned" Challenger and Kelly under the statute "due to its all-encompassing development of and control over the Parks from their inception." Even if the district did not own the entirety of the parks, it owned the facilities and areas within. Such facilities included a jogging path, playground and dog-friendly area, as well

---

[3]The City's ordinances address speed camera violations (Chicago Municipal Code § 9-101-020 (added Apr. 18, 2012)) and specify that "owner" and "safety zone" have the same meaning as set forth in section 11-208.8(a) of the Vehicle Code (Chicago Municipal Code § 9-101-010(c) (added Apr. 18, 2012)).

as landscaped areas and multipurpose fields. Furthermore, the City argued that for purposes of determining the extent of a safety zone, the distance of one-eighth of a mile had to be measured "from the 'property line' of the parcel on which the recreational facility or area sits," as opposed to each individual area or facility.

¶ 23    Numerous exhibits were attached to the City's motion, including the 1991 Agreement, the 2018 Agreement, an aerial photo of the parks and deposition transcripts from the depositions of several City and Chicago Park District employees.

¶ 24    In response, plaintiffs argued that the definition of "park district" found in section 11-605.3 did not apply and the City was not a park district. In addition, the Chicago Park District's management of Challenger and Kelly did not make the district their owner. Plaintiffs further argued that the City owned the improvements to the parks until at least 2018. Moreover, the City presented no evidence that any specific "facilities" or "areas" were within one-eighth of a mile of the speed cameras. Numerous items were attached to the response, including deposition transcripts and emails.[4]

¶ 25    On June 23, 2023, the circuit court entered a written order granting the City's motion for summary judgment. The court found that the Chicago Park District owned Challenger for the purposes of the speed camera statute. Although the district lacked the right to sell or transfer Challenger, the district held the right to control, operate and alter it. Even assuming that the Chicago Park District did not own Challenger under the speed camera statute, the City did, and it qualified as a "park district" under the definition found in section 11-605.3 due to the City's operation of public recreation facilities on land not owned by a park district formed under the

---

[4]The copy of the response contained in our record on appeal appears to be incomplete, as the body of that motion ends abruptly.

Park District Code (70 ILCS 1205/1 *et seq.* (West 2012)) or the Chicago Park District Act (70 ILCS 1505/1 *et seq.* (West 2012)).

¶ 26    In reaching this determination, the circuit court declined to address the City's argument that the placement of the speed cameras was appropriate because the Chicago Park District owned certain facilities and areas within Challenger. The court also declined to address the parties' arguments with respect to Kelly.

¶ 27                                    II. Analysis

¶ 28    Summary judgment is warranted where the record, when viewed in the light most favorable to the nonmovant, shows that no genuine issue of material fact exists, entitling the movant to judgment as a matter of law. *Underwood v. City of Chicago*, 2023 IL App (1st) 211317, ¶ 35. While summary judgment constitutes an expeditious manner of disposing of a legal action, it should only be used when the movant's right to judgment is clear and free from doubt. *Id.* We review the circuit court's summary judgment decision *de novo*. *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 34. Thus, we may affirm the circuit court's judgment on any basis found in the record, regardless of the circuit court's reasoning. *Id.*

¶ 29    We similarly interpret the meaning of statutory terms *de novo*. *Maschek v. City of Chicago*, 2015 IL App (1st) 150520, ¶ 42. The primary objective of statutory construction is to effectuate the legislature's intent. *Schultz v. St. Claire County*, 2022 IL 126856, ¶ 19. In addition, the best indication of that intent is the plain and ordinary meaning of the statute's language. *Id.* A statute must also be examined as a whole. *Chapman v. Chicago Department of Finance*, 2023 IL 128300, ¶ 29. Thus, words and phrases should be construed in relation to one another, and no word should be rendered meaningless. *Schultz*, 2022 IL 126856, ¶ 19. Where the legislature's

intent is discernible from the statute's plain language, courts will not resort to other aids of statutory construction. *Id.*

¶ 30                                    A. Speed Camera Statute

¶ 31    The speed camera statute was enacted in July 2011, and no amendments pertinent to our inquiry have been made since then. 625 ILCS 5/11-208.8 (West 2012). It "applies only to municipalities with a population of 1,000,000 or more inhabitants," in other words, the City. *Id*. § 11-208.8(s). Under that statute,

> "[a]n automated speed enforcement system is a system, located in a *safety zone* which is under the jurisdiction of a municipality, that produces a recorded image of a motor vehicle's violation of a provision of this Code or a local ordinance and is designed to obtain a clear recorded image of the vehicle and the vehicle's license plate." (Emphasis added.) *Id*. § 11-208.8(a).

Relevant here, a "safety zone *** includes an area that is within one-eighth of a mile from the nearest property line of any facility, area, or land *owned by a park district* used for recreational purposes." (Emphasis added.) *Id*.[5]

¶ 32    The City contends that the speed cameras in question were appropriately placed in safety zones based on their proximity to Challenger and Kelly, as those parks are owned by a park district, the City itself. Alternatively, the location of the speed cameras was proper because the

---

[5]The definition of "safety zone" also encompasses "an area that is within one-eighth of a mile from the nearest property line of any public or private elementary or secondary school, or from the nearest property line of any facility, area, or land owned by a school district that is used for educational purposes ***, not including school district headquarters or administrative buildings." 625 ILCS 5/11-208.8(a) (West 2012).

Chicago Park District owns facilities, areas or land in those parks. We begin with the City's first theory.[6]

¶ 33                                     B. Park District

¶ 34     The speed camera statute does not define "park district." *Id*. Plaintiffs suggest that "park district" unambiguously refers to one formed under the Park District Code (70 ILCS 1205/1-1 *et seq*. (West 2012)) or the Chicago Park District Act (70 ILCS 1505/1 *et seq*. (West 2012)), the only two Illinois acts purporting to create park districts. Notably, the City falls under neither category.

¶ 35     In contrast, the City argues that "park district" contemplates a broader meaning. Had the legislature intended to limit "park district" to entities formed under the aforementioned legislation, the speed camera statute would have specifically said so. The City ultimately contends, however, that "park district" is ambiguous. Although plaintiffs argue that the City failed to raise the statute's ambiguity below, we find that ambiguity was sufficiently implied.

¶ 36     The speed camera statute is ambiguous, as it is reasonably susceptible to multiple meanings. See *In re Marriage of Goesel*, 2017 IL 122046, ¶ 13. The statute could reasonably be read to refer to districts formed under the Park District Code or the Chicago Park District Act. Yet, we also find the legislature's omission of any reference to such legislation could be reasonably interpreted to include other entities. Where the language of a statute is ambiguous, we may resort to other aids of statutory construction, including the statute's legislative history and debates, to determine the legislature's intent. *Maschek*, 2015 IL App (1st) 150520, ¶ 44.

---

[6]To the extent that the City relies on home rule authority (Ill. Const. 1970, art. VII, § 6(a), (m)), we note that "all municipalities are limited to enacting traffic ordinances that are consistent with the provisions of chapter 11" (*People ex rel. Ryan v. Village of Hanover Park*, 311 Ill. App. 3d 515, 525 (1999)).

¶ 37                                    1. Legislative History

¶ 38    The legislative history of the speed camera statute makes clear that in enacting the statute, the legislature was concerned with pedestrian safety, particularly with respect to children. 97th Ill. Gen. Assem., Senate Proceedings, Oct. 26, 2011, at 61, 63, 65, 76; see also *Maschek*, 2015 IL App (1st) 150520, ¶ 67. For example, Senator John Cullerton observed that Chicago's pedestrian fatality rate was 86% higher than New York City's rate. 97th Ill. Gen. Assem., Senate Proceedings, Oct. 26, 2011, at 61 (statements of Senator Cullerton).

¶ 39    That being said, the comments shed no light on what kinds of parks, let alone park districts, would serve as the basis for a safety zone. Some comments referred to "parks" in general. 97th Ill. Gen. Assem., Senate Proceedings, Oct. 26, 2011, at 77; 97th Ill. Gen. Assem., House Proceedings, Nov. 9, 2011, at 108, 110, 112, 131, 145. In addition, Senator Cullerton stated that a safety zone "would be an area *basically* a block from *any* *** park in the City of Chicago." (Emphases added.) 97th Ill. Gen. Assem., Senate Proceedings, Oct. 26, 2011, at 59 (statements of Senator Cullerton). The language of the speed camera statute itself, however, dispels the notion that the legislature intended for *any* park to support a safety zone. To hold otherwise would render the statute's reference to a park district superfluous. See 625 ILCS 5/11-208.8 (West 2012).

¶ 40    Aside from confirming that the speed camera statute is intended to further safety, the legislative history does not answer the present question. See also *Thoman v. Village of Northbrook*, 148 Ill. App. 3d 356, 357 (1986) (stating that a safety statute is entitled to a liberal interpretation to effectuate the statute's purpose and "afford broad protection to those the statute is designed to protect"). We must consult other rules of construction.

¶ 41    Legislative intent may also be discerned from examining terms used in other sections of the same legislation or other Illinois statutes. *Christ Hospital & Medical Center v. Illinois Comprehensive Health Insurance Plan*, 295 Ill. App. 3d 956, 961 (1998). The doctrine of *in pari materia* provides that two statutes addressing the same subject will be considered with reference to one another to achieve a harmonious effect. *Coley v. Bradshaw & Range Funeral Home, P.C.*, 2020 IL App (2d) 190627, ¶ 31. Our ability to import definitions from other statutes is limited, however, to the context in which the term is used. *Christ Hospital & Medical Center*, 295 Ill. App. 3d at 961. "Even when two statutes share nearly identical definitions, there can be critical differences in context, or limiting language elsewhere in one statute, that qualifies the term in question." *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 29. Thus, a term's definition or meaning cannot be blindly transferred from one context to another. *State ex rel. Leibowitz v. Family Vision Care, LLC*, 2020 IL 124754, ¶ 54.

¶ 42                                2. Section 1-156.5

¶ 43    The Vehicle Code contains two definitions of "park district." First, section 1-156.5 defines it as "[a]ny park district formed under the Park District Code or any Submerged Land Park District as that term is defined in subsection (c) of Section 1-3 of the Park District Code." 625 ILCS 5/1-156.5 (West 2012). Yet, section 1-101 also specifies that that definition does not apply "when the context otherwise requires." *Id*. § 1-101.

¶ 44    The parties apparently agree that this definition of "park district" cannot be applied in the context of the speed camera statute. While the plain language of section 1-156.5 does not include the Chicago Park District, "park district," as used in the speed camera statute, *must* include the Chicago Park District. This is because Chicago is the only municipality to which the speed camera statute applies. See *id*. § 11-208.8(s).

¶ 45                                    3. Section 11-605.3

¶ 46    We now consider section 11-605.3 of the Vehicle Code (*id*. § 11-605.3), which was

enacted in May 2006, about five years prior to the enactment of the speed camera statute.[7]

¶ 47    Section 11-605.3, titled, "[s]pecial traffic protections while passing parks and recreation

facilities and areas," provides that on days when children are present, "a person may not drive a

motor vehicle at a speed in excess of 20 miles per hour or any lower posted speed while traveling

on a *park zone street*." (Emphasis added.) *Id*. § 11-605.3(b), (c). That statute also sets forth a

violation for failing "to come to a complete stop at a stop sign or red light" while traveling in a

park zone street. *Id*. § 11-605.3(c). Furthermore, "park zone" means, in pertinent part, "the

recreation facilities and areas on any land owned or operated by a *park district* that are used for

recreational purposes." (Emphasis added.) *Id*. § 11-605.3(a)(2). Thus, like the speed camera

statute, section 11-605.3 essentially pertains to traffic safety near parks operated by a "park

district."

¶ 48    Section 11-605.3(a)(1) further states that

        "[a]s used in this Section:

                (1) 'Park district' means the following entities:

                        (A) any park district organized under the Park District Code;

                        (B) any park district organized under the Chicago Park District Act; and

                        (C) any municipality *** or other unit of local government that operates a

                public recreation department or public recreation facilities that has recreation

                facilities that are not on land owned by any park district listed in subparagraphs

                (A) and (B) of this subdivision (a)(1)." *Id*. § 11-605.3(a)(1).

---

[7]The introduction to Public Act 94-808 (eff. May 6, 2006) states that "ensuring Safe Streets near educational and recreational facilities is a goal requiring the full attention of this General Assembly."

¶ 49    Given that the speed camera statute and section 11-605.3 are both concerned with traffic safety near parks, we find it appropriate to import the latter statute's definition of "park district." The legislature was clearly aware of that definition when it enacted the speed camera statute. See *Christ Hospital & Medical Center*, 295 Ill. App. 3d at 961 (presuming that the legislature, when drafting the statute in question, was aware of the construction and use of the term in other legislation).

¶ 50    We are not persuaded by plaintiffs that the legislature deliberately omitted section 11-605.3's definition of "park district" from the speed camera statute. *Cf. People v. Clark*, 2019 IL 122891, ¶¶ 22-23 (stating that where one statutory offense could be committed many ways, the inclusion of "custody" in just one clause showed the legislature intended the other clauses to have different meanings). Although section 11-605.3's definition of "park district" is prefaced by the language, "[a]s used in this Section," this merely demonstrates that other sections *may* require different definitions, not that they *must*. Furthermore, the very existence of section 11-605.3(a)(1)(C), recognizing park districts other than those formed under the Park District Code and the Chicago Park District Act, refutes plaintiffs' assertion that our legislature has never recognized any park district formed outside of such legislation.

¶ 51    We are also unpersuaded by plaintiffs' assertion that section 11-605.3's definition cannot be applied to the speed camera statute because that statute's definition of "safety zone" differs from the definition of "park zone" in section 11-605.3. Compare 625 ILCS 5/11-605.3(a)(3) (West 2012), with *id*. § 11-208.8(a). One would expect different terms to carry different definitions. This difference does not mean that the contexts of the two statutes are at odds. Additionally, plaintiffs have not developed a cohesive argument explaining why the City would be required to designate Irving Park Road and Broadway Avenue as "park zone streets" under

section 11-605.3 in order to establish safety zones under the speed camera statute. The legislature has given the City multiple options to accomplish its safety goals. Furthermore, plaintiffs themselves acknowledge that the City may not be able to identify Broadway Street as a park zone street because it is not adjacent to park zone. See *id*. § 11-605.3(a)(3).

¶ 52    We further reject plaintiffs' assertion that section 11-605, titled "[s]pecial speed limit while passing schools," undermines our determination. *Id*. § 11-605. That section, much like portions of the speed camera statute not at issue here, seeks to protect children near schools. Compare *id.*, with *id*. § 11-208.8(a) (West 2012). Plaintiffs argue that the two statutes define "school" differently, demonstrating that they, and somehow, section 11-605.3, involve meaningfully different contexts.

¶ 53    Contrary to plaintiffs' assertion, the speed camera statute does not purport to define "school." Instead, the statute lists certain types of school district property in defining a "safety zone." Furthermore, plaintiffs have not developed a cohesive argument showing that section 11-605 has any bearing on section 11-605.3.

¶ 54    Moreover, plaintiffs argue that because section 11-208.8(a) refers to both a "park district" and a "municipality," one entity cannot be both under that statute. We disagree. While this shows that the terms are not synonymous, it does not show that they are mutually exclusive. See *id*. § 11-208.8(a) (West 2012) (referring to a "safety zone which is under the jurisdiction of a *municipality*" and measuring a safety zone based on distance from property "owned by a *park district*" (emphases added)).

¶ 55                                   4. The City's Role

¶ 56    We must now determine whether the City satisfies the definition of "park district" set forth in section 11-605.3(a)(1)(C). A "park district" is a "municipality *** that *operates* a public

15

recreation department or public recreation facilities that has recreation facilities that are not on land owned by" a park district organized under the Park District Code or the Chicago Park District Act. (Emphasis added.) *Id*. § 11-605.3(a)(1).

¶ 57    The City does not contend that it "operates" Challenger or Kelly. Instead, it asserts that it constitutes a Park District, even in relation to those parks, because it "operates" Millenium Park and the Riverwalk.[8]

¶ 58    As the City acknowledges in its brief, "municipalities perform many functions." While the City may be a park district to the extent that it operates Millenium Park and the Riverwalk, it is not acting as a park district when, for example, it engages in residential refuse collection. It follows that the City is not a park district with respect to all parks merely because it operates some. See *In re Marriage of Goesel*, 2017 IL 122046, ¶ 13 (recognizing that we presume the legislature did not intend to achieve an absurd result).

¶ 59    Because the City does not operate Challenger or Kelly, it does not constitute a park district in this context. The City's role in those parks does not support the creation of safety zones or the presence of speed cameras. Therefore, the propriety of the speed cameras' placement depends on the Chicago Park District's role with respect to Challenger and Kelly.

---

[8]The record does not show the degree of the City's control over and involvement in Millenium Park and the Riverwalk. While the City suggests that it owns and operates Millennium Park (*FAQs*, Millennium Park Foundation, https://millenniumparkfoundation.org/faqs/ (last visited Nov. 25, 2025) [https://perma.cc/2AGT-VXT9]), the Chicago Park and City Exchange of Functions Act states that "the Chicago Park District shall comprise all of the City of Chicago." 70 ILCS 1505/1 (West 2012); see also 70 ILCS 1545/3 (West 2012). That act also states that "[t]he territory known as Grant Park shall be under the jurisdiction of the Chicago Park District." 70 ILCS 1505/26.10-1 (West 2012); see also *Millennium Park Joint Venture, LLC v. Houlihan*, 241 Ill. 2d 228, 309-312 (2010) (stating that the Chicago Park District maintained extensive control over certain property in Millenium Park).

¶ 60                                    C. Ownership

¶ 61     As stated, a "safety zone *** includes an area that is within one-eighth of a mile from the nearest property line of any facility, area, or land *owned* by a park district used for recreational purposes." (Emphasis added.) 625 ILCS 5/11-208.8(a) (West 2012). Although the Chicago Park District is indisputably a park district under the speed camera statute, the question is whether it owns some portion of Challenger or Kelly sufficient to authorize the creation of safety zones and the City's installation of speed cameras.

¶ 62     Plaintiffs, relying heavily on title, contend that the Chicago Park District does not own Challenger or Kelly. Conversely, the City argues that while the district does not hold title to the parks, the district is nonetheless an owner of the parks' facilities, areas and land within the meaning of the statute.

¶ 63                                    1. Statutory Language

¶ 64     The concept of ownership is not defined by the speed camera statute. Considering the statute as a whole, however, we may decipher its meaning.

¶ 65     The statute's plain language refers to the ownership of not only land, but of a "facility" or "area" as well. These items are not often spoken of in terms of legal title. Thus, we do not believe the legislature intended for ownership of park property to be limited to such formalities. See also *City of Chicago v. Illinois Department of Revenue*, 147 Ill. 2d 484, 504 (1992) (stating, in the context of the Revenue Act of 1939 (Ill. Rev. Stat. 1987, ch. 120, ¶ 500.6), that where the legislature does not require legal ownership, actual ownership, either legal or equitable, will suffice); Black's Law Dictionary (12th ed. 2024) (stating that "legal title" is one "that evidences apparent ownership but does not necessarily signify full and complete title or a beneficial interest").

¶ 66     The speed camera statute provides additional support for this determination.  It specifically defines the "owner" of a vehicle as "the person or entity to whom the vehicle is registered." 625 ILCS 5/11-208.8(a) (West 2012). If the legislature had intended the "owner" of park property to be limited to the entity to whom the land was registered, it could have said as much. Thus, ownership cannot be confined to legal title alone in this context.

¶ 67     While not relevant to our reading of the statute's plain language, we also note that this determination is consistent with the realities of the Chicago Park District. Heather Gleason, a district employee, testified that not all of the district's parks are on land owned by the district. Some, for example, sit on land owned by the Water Reclamation District.

¶ 68     Plaintiffs argue that because the definition of "park district" found in section 11-605.3(a)(1)(C) refers to both ownership and operation, the two cannot be equated for the purposes of the speed camera statute. In other words, the Chicago Park District cannot be deemed an owner of the parks solely because it operates them. Plaintiffs' point is well taken, as we cannot render any term superfluous.

¶ 69     Thus, the statute's language shows that something less than title but more than operation is required to show ownership of park property. We must find the balance between the two.

¶ 70                             2. Control, Benefits and a Bundle of Rights

¶ 71     Illinois courts have recognized in other contexts that control, rather than title, determines ownership. See, *e.g.*, *People v. Chicago Title & Trust Co.*, 75 Ill. 2d 479, 489 (1979) (stating in the context of taxation involving a land trust that "[t]itle refers only to a legal relationship to the land, while ownership is comparable to control and denotes an interest in the real estate other than that of holding title thereto"); *Robinson v. Walker*, 63 Ill. App. 2d 204, 209 (1965) (stating that, under the Dram Shop Act (Ill. Rev. Stat. 1961, ch. 43, ¶ 135), "owner" has no fixed

meaning, does not always signify rightful title, and can denote control without absolute title); see also *United States v. Miller*, 39 F.4th 844, 851 (7th Cir. 2022) (observing that "[t]he idea that title does not always control ownership disputes extends beyond taxes to other areas in Illinois law"). In addition, ownership has been likened not only to control, but the right to enjoy a property's benefits. *Chicago Title & Trust Co.*, 75 Ill. 2d at 489; *Wheaton College v. Department of Revenue*, 155 Ill. App. 3d 945, 946 (1987). Similarly, as plaintiffs acknowledge, courts have often referred to ownership of property as a "bundle of rights." *Ford Motor Co. v. Korzen*, 30 Ill. 2d 314, 321-22 (1964); *Village of Riverdale v. Nosmo Kings, LLC*, 2023 IL App (1st) 221380, ¶ 18. That bundle includes the right to (1) possess the property; (2) use and enjoy it; (3) change or improve it; and (4) alienate it. *Wheaton College*, 155 Ill. App. 3d at 946.

¶ 72     In light of the foregoing, we find that an entity may "own" a facility, area or land used for recreational purposes when that entity controls and enjoys the benefits of such property, considering the essential bundle of rights that constitute characteristics of ownership.

¶ 73                                3. The 1991 Agreement

¶ 74     We initially address the Chicago Park District's relation to Challenger, beginning with the 1991 Agreement. That agreement stated that the district would not only use and maintain Challenger but would "regulate the use of" portions of the park as well. Indeed, the district was the only party to the agreement charged with regulating that park. This is consistent with legislation pertaining to the governance of the parks, legislation that the parties have not addressed. See 70 ILCS 1505/7.02 (West 2012) (stating that "[t]he commissioners of the Chicago Park District, *** may *** establish by ordinance all needful rules and regulations for the government and protection of parks, *** and other property under its jurisdiction"); see also 70 ILCS 1545/3 (West 2012). In other words, the Chicago Park District did not merely maintain and

19

operate Challenger: it set the rules. Importantly, regulation connotes control. See Black's Law Dictionary (12th ed. 2024) (defining regulate as "[t]o control (an activity or process) esp. through the implementation of rules"). Furthermore, the district benefitted from its regulation of the parks to the extent it enabled the district to fulfill its mission.

¶ 75     With respect to at least some portion of Challenger, the 1991 Agreement gave the Chicago Park District the right to possess it, use it, enjoy it, and change it. The sole factor weighing against the district's ownership is its inability to alienate the property. We find that this single factor, however, is insufficient to create a genuine issue of material fact in the context of parks intended to benefit the public, property that does not regularly change hands. *Cf. City of Chicago*, 147 Ill. 2d at 508 (finding the City was not the property owner for purposes of a tax exemption where it held possession, the right to sublet, and the right to build or remove structures, but another entity held legal title, enjoyed accelerating annual rent payments and would require full possession of the land when the sublease terminated); *Wheaton College*, 155 Ill. App. 3d at 947 (finding the plaintiff did not own property under a lease for the purpose of a tax exemption, which is strictly construed in favor of liability, where the plaintiff could remove existing structures and sublease the property but did not have the right to fully alienate it).

¶ 76     In reaching this determination, we reject plaintiffs' argument that the Chicago Park District did not own park property because the 1991 Agreement referred to the district having a "license" to park property. See *Boland v. Walters*, 346 Ill. 184, 188 (1931) (stating that a license is permission to do a series of acts on another's land without possessing an interest in it). Plaintiffs ignore that the agreement also refers to the district "leasing" portions of the park property. More importantly, our focus in this context is on the realities of ownership, not formal categories of possession or the lack thereof.

¶ 77    We also reject the parties' reliance on deposition testimony from the employees of the City and the Chicago Park District referring to "ownership" of the parks. Those witnesses' conclusions as to ownership are of limited usefulness, absent any showing that they were referring to ownership as contemplated by the speed camera statute.[9] We further find that plaintiffs have failed to demonstrate how the City's payment for park improvements under the 1991 Agreement has any bearing on ownership.

¶ 78    Thus, the Chicago Park District owned at least some of the land, facilities, or areas in Challenger until the agreement expired on December 31, 2015.

¶ 79                                        4. The Interim

¶ 80    As stated, the 1991 Agreement provided that, upon the contract's expiration, the Chicago Park District "shall surrender and deliver up to [the City] the premises leased by this Agreement without delay." This provision appears to have contemplated some action on the district's part. Yet, the record indicates that the City did not complain when the district took no action.[10]

¶ 81    The 1991 Agreement also stated that upon its expiration, "all Improvements shall become the property of the owner of the respective premises on which such Improvements are located." This provision appears to be self-executing. *Janes v. Centegra Health System*, 308 Ill. App. 3d 779, 786 (1999) (stating that "[a] self-executing instrument is one that is 'effective immediately without the need of any type of implementing action' " (quoting Black's Law Dictionary 1364 (7th ed. 1999))). In addition, the parties executed no written modifications, as was required for any modification to be valid under the terms of the agreement. Plaintiffs argue this shows that at

---

[9]To the extent plaintiffs challenge the admissibility of certain deposition testimony, they have failed to develop a cohesive argument supported by citations to authority. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

[10]The parties have not engaged in any meaningful contract interpretation or otherwise cited legal authority showing that contract interpretation is irrelevant here. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

the end of 2015, ownership of improvements reverted to the City, which held title to the premises.

¶ 82    Regardless of what was supposed to have happened, or what did happen from the formal perspective of title and the 1991 Agreement, the record shows that the parties maintained the status quo upon the agreement's expiration. The district continued to control and benefit from the improvements upon the agreement's expiration. Indeed, Chicago Park District employee Doreen O'Donnell testified in her deposition that "when an agreement expires, it really doesn't expire in the point that we continue month to month until we have a new agreement in place. So just because there's a date there doesn't mean we pack up our bags and leave."

¶ 83    We recognize that the 1991 Agreement specified that the City could not waive any contract term by failing "to insist upon the strict performance" thereof. It is equally true, however, that the City never tried to enforce its ownership of the land and improvements against the Chicago Park District during that period. Moreover, plaintiffs, who are strangers to the agreement, have not shown that they have a right to enforce that agreement now.

¶ 84    Plaintiffs argue that the 2018 Agreement shows that the Chicago Park District did not own improvements to the park prior to the execution of that agreement, which stated that the district "shall *own*, insure and maintain any recreational improvements." (Emphasis added.) According to plaintiffs, there would have been no reason to include this provision if the district already owned such improvements. This provision may have been added, however, to protect future improvements or to reflect the status quo.

¶ 85    Plaintiffs further cite an e-mail that Karen Bielarz, senior counsel with the City's Department of Law, wrote during discussions regarding the 2018 Agreement. Bielarz stated, "[i]f the city is coming onto its own property it does not need an access permit." At most, this shows

22

that the Chicago Park District could not exclude the City. In the context of a *public* park, however, this minor limitation on the district's control does not compel a finding that the district did not own Challenger during this period.

¶ 86    After the 1991 Agreement's expiration, the Chicago Park District continued to "own" whatever they had owned while that agreement was in effect.

¶ 87                                   5. The 2018 Agreement

¶ 88    Finally, we examine the record with respect to the Chicago Park District's ownership of Challenger following the execution of the 2018 Agreement.

¶ 89    The agreement stated that the district would maintain and operate Challenger "in accordance with the usual and customary rules and regulations governing use and occupancy of property operated or maintained by the Park District." Consistent with that provision, Dennis Gonzalez, the supervisor of Challenger and Kelly, testified in his deposition that those parks were subject to the same Chicago Park District policies and guidelines that other parks were subject to. As with prior periods, the record shows that the district continued to control, and therefore "own," portions of Challenger by setting the rules. In addition, the agreement specifically provided that the district would "own" recreational improvements.

¶ 90    Plaintiffs observe that the 2018 Agreement stated that Challenger was located on property "owned by the City" and that the agreement granted the district the right to "use" but not "possess" portions of the property, creating a license instead of a possessory interest. We reiterate, however, that such formalities are not controlling in this context.[11]

_____

[11]The 2018 Agreement also stated that "this Agreement shall not run to the benefit of, or be enforceable by, any person or entity other than a Party to this Agreement and its successors." The parties have not addressed this.

¶ 91    We find that following the execution of the 2018 Agreement, the Chicago Park District owned at least some portion of Challenger within the meaning of the speed camera statute, just as it did in the prior periods.

¶ 92                                    6. Kelly

¶ 93    As for Kelly, the 2018 Agreement gave the Chicago Park District the same level of control over Kelly as it had over Challenger. Thus, the district owned portions of Kelly from at least the execution of that agreement to the present. Although there were no prior written or oral agreements involving Kelly, Bielarz testified in her deposition that the 2018 Agreement was intended to maintain the status quo and the agreement did not involve the transfer of property. O'Donnell similarly testified that there was no transfer of property. This indicates that just as the Chicago Park District owned Kelly's recreational improvements and set the parks' rules after the 2018 Agreement was executed, it did so before as well. The record is silent, however, as to when such control and ownership began. Gleason testified that the district had "controlled" both Challenger and Kelly for decades, but the extent of that control is unclear at this juncture.

¶ 94    Construing the record in the light most favorable to plaintiffs, as we must, we find a genuine issue of material fact exists as to when the Chicago Park District's ownership of property in Kelly began.

¶ 95                                    D. Facility

¶ 96    We have determined that the Chicago Park District owned at least some property within Challenger and Kelly. Yet, to support a safety zone and speed camera, that property must be a "facility, area, or land." 625 ILCS 5/11-208.8 (West 2012). The parties dispute the meaning of "facility."

24

¶ 97     Under its common meaning, a "facility" is "something *** that is built, installed, or established to serve a particular purpose." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/facility (last visited Nov. 25, 2024) [https://perma.cc/72T6-K47G]. Without addressing every item owned by the district, we find that Challenger's jogging path, as well as the lighting and water fountains that accompany it, were undoubtedly installed to serve a particular purpose: recreation. In other words, such improvements constitute facilities. Accordingly, we categorically reject plaintiffs' argument that there are no facilities in Challenger or Kelly.

¶ 98     Plaintiffs argue that the speed camera statute refers to the "property line" of a facility. Thus, under the plain language of the statute, a facility must have a discernible "property line." While park facilities such as water fountains are not ordinarily thought of in terms of property lines, they nonetheless have outer dimensions. We cannot say that the statute's use of the words "property line" requires us to set aside the plain meaning of facility in this case.

¶ 99     Plaintiffs also directs us to statutes outside of the Vehicle Code. See, *e.g.*, 415 ILCS 5/3.330(a)(1)(iv) (West 2012) (defining a "pollution control facility"); 55 ILCS 5/5-1097.5 (West 2012) (defining an "adult entertainment facility"). Plaintiffs have not, however, attempted to demonstrate that the contexts of those statutes are remotely similar. See also 70 ILCS 3205/2(b) (West 2012) (stating in the context of the Illinois Sports Facilities Authority Act that "facility" means, among other things, "structures for the holding of athletic contests," "[p]ractice fields," and parking lots, walkways, landscaping, and open spaces "related to or located near" the foregoing structures and fields).

¶ 100                              E. One-Eighth of a Mile

¶ 101   Last but not least, the parties dispute how to determine the area of a safety zone. For our

purposes, a safety zone is "an area that is within one-eighth of a mile from the nearest property

line of any facility, area, or land owned by a park district used for recreational purposes." 625

ILCS 5/11-208.8 (West 2012). Plaintiffs argue that the safety zone, and the location of a speed

camera, must be measured from the property line of each individual facility, area or land owned

by a park district, whereas the City contends that a safety zone must be measured from the parks'

borders.

¶ 102   Before addressing their contentions, we consider competing rules of statutory

interpretation. On the one hand, we presume "that the legislature did not intend an absurd or

unjust result." *In re Marriage of Murphy*, 203 Ill. 2d 212, 219 (2003). On the other hand, we

cannot " 'correct' an apparent legislative oversight by rewriting a statute in a manner inconsistent

with its clear and unambiguous language." *Id.*; *Revolution Portfolio, LLC v. Beale*, 332 Ill. App.

3d 595, 603-04 (2002) (same). Still, the rule against absurd results merely allows a court to favor

a construction of the text that is otherwise reasonable over a more literal interpretation that

would lead to a result that is at odds with any conceivable legislative purpose. *Scott v. American

Alliance Casualty Co.*, 2024 IL App (4th) 231305, ¶ 20 (citing *In re D.F.*, 208 Ill. 2d 223, 249-50

(2003)). The rule is not a license to ignore or rewrite statutory language solely because it would

produce a result that is undesirable for policy reasons. *Id.* (citing *D.F.*, 208 Ill. 2d at 249-50).

¶ 103   Plaintiffs' reading comports with the statute's plain language. The statute refers to the

property line of a facility, not the property line of the park containing that facility. While this

form of measurement is certainly more cumbersome, it is not entirely inconceivable that the

legislature deliberately adopted this method of measurement. If the City were permitted to

measure a safety zone from the property line of a large parcel containing one small park district-owned facility, this could greatly expand the size of the safety zone and the number of places where the City could install a speed camera. In that instance, the City's decision to install a speed camera could be based on potential revenue rather than safety. See also 97th Ill. Gen. Assem., Senate Proceedings, Oct. 26, 2011, at 62 (statement of Senator Duffy) (stating, "[t]hey *** say these cameras are all about safety when we all know it's all about revenue"); 97th Ill. Gen. Assem., House Proceedings, Nov. 9, 2011, at 137 (statement of Representative Franks) (stating that "this [b]ill *** is simply to raise revenue").

¶ 104   Conversely, the City's reading of the statute would require us to add language to the statute to refer to a "park containing" one of the enumerated items. This we cannot do.

¶ 105   The record does not support the City's suggestion that any facilities, areas and land owned by the Chicago Park District have at all relevant times extended to the boundaries of Challenger and Kelly. For example, the 2018 Agreement granted the Chicago Park District "the use of *portions* of the Property." (Emphasis added.) Furthermore, City employees measured safety zones, and the placement of the speed cameras at issue, only from the parks' borders. Accordingly, a genuine issue of material fact exists as to whether the speed cameras in question are properly located within a safety zone.

¶ 106                                    III. Conclusion

¶ 107   The City is not a "park district" under the speed camera statute with respect to Challenger and Kelly, but the Chicago Park District "owned" at least portions of those parks. Genuine issues of material fact remain as to (1) when the district became the owner of Kelly, (2) which portions of Challenger and Kelly were owned by the district, (3) the location of the resulting safety zones, and (4) whether the City's speed cameras fell within those safety zones. Accordingly, we reverse

27

the circuit court's order granting summary judgment in favor of the City and remand for further proceedings consistent with this opinion.

¶ 108   Reversed and remanded.

¶ 109   JUSTICE PUCINSKI, concurring in part and dissenting in part:

¶ 110   I believe the municipality, the City of Chicago, is a "park district" within the meaning of the speed camera statute because it does own and operate at least two parks used for recreational purposes.

¶ 111   I concur that there are questions of material fact in this case that defeat summary judgment, and, thus, I agree with the majority to reverse and remand for further proceedings.

¶ 112   I also note that the City was incredibly sloppy about its management of paper trails; for example, contracts were not extended, renewed, or rewritten on time; ordinances were not passed; and signs were not installed. Although managing a huge city must have many challenges, keeping up with the necessary paperwork and deadlines protects the City's interests and keeps the record clear whenever there is a problem.

---

*Levine v. City of Chicago*, **2024 IL App (1st) 231245**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CH-16683; the Hon. Pamela McLean Meyerson, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Mark Roth, of Roth Law LLC, of Chicago, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Mary B. Richardson-Lowry, Corporation Counsel, of Chicago (Myriam Zreczny Kasper, Suzanne M. Loose, and Stephen G. Collins, Assistant Corporation Counsel, of counsel), for appellee. |

---